2016 IL App (1st) 130698

FOURTH DIVISION
June 30, 2016

No. 1-13-0698

THE PEOPLE OF THE STATE OF ILLINOIS,          )          Appeal from the
                                              )          Circuit Court of
    Plaintiff-Appellee,                     )          Cook County.
                                              )
v.                                            )          No. 11 CR 07414-01
                                              )
LAMARR MAXEY,                                 )          Honorable
                                              )          Noreen V. Love,
    Defendant-Appellant.                    )          Judge Presiding.

    PRESIDING JUSTICE McBRIDE delivered the judgment of the court, with opinion.
    Justice Howse concurred in the judgment and opinion.
    Justice Ellis concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1    Following a bench trial, defendant Lamarr Maxey was found guilty of residential burglary and aggravated fleeing or attempting to elude a peace officer. The trial court subsequently sentenced defendant to concurrent terms of 20 years for the residential burglary conviction and 3 years for the aggravated fleeing conviction.

¶ 2    Defendant appeals, arguing that: (1) defendant's waiver of counsel was invalid because the trial court failed to properly admonish him pursuant to Illinois Supreme Court Rule 401(a) (eff. July 1, 1984); (2) during the suppression hearing, the trial court erred in allowing the State to question defendant on irrelevant matters and in excluding relevant evidence; (3) the trial court did not obtain a knowing and voluntary jury waiver; (4) the State failed to prove the charge of aggravated fleeing or attempting to elude a peace officer; and (5) the fines and fees order should

be reduced by $24 due to improperly imposed fines and full credit for time in custody awaiting trial.

¶ 3    On April 18, 2011, defendant, along with codefendant Shadeed Love, was arrested and charged with residential burglary of Robert Fjeldheim and his residence at 333 Jackson Boulevard in Hillside, Illinois.  Defendant was also charged with aggravated fleeing or attempting to elude a peace officer.[1]

¶ 4    Defendant first appeared before Judge Kristyna Ryan on April 19, 2011, and assistant public defender Thomas Tucker was appointed. .  The court found probable cause to detain and set defendant's bond at $400,000.  On April 22, 2011, defendant appeared before Judge Gilbert Grossi, and was represented by assistant public defender Michael Halloran.  Defendant indicated to the court that he wished to represent himself.  The following colloquy then took place.

"DEFENDANT: I'm *pro se*. The Public Defender's office is not representing me.

THE COURT: Who said that?

DEFENDANT: I informed him already.  At this time, I would like to ask for all, any and all —

THE COURT: Let's slow down here. You're getting ahead of yourself.  Did you go to law school?

DEFENDANT: I'm very familiar with the law, but I don't want – I'm exercising my constitutional right.  I don't want the Public Defender's Office representing me.

THE COURT: Have you been charged with a felony before?

_____

[1] Defendant was later charged by indictment with attempted first degree murder and attempted armed robbery.

2

DEFENDANT: Yes, I have.

THE COURT: Well, this is residential burglary, which means you can to go the penitentiary between four and 15 years.

DEFENDANT: Right. Being advised of that, I'm–I would still like to exercise my constitutional rights.

THE COURT: Slow down. We are not done yet. Have you ever represented yourself before?

DEFENDANT: Yes, I have.

THE COURT: And what happened to the case?

DEFENDANT: I had a split verdict.

THE COURT: What was the split verdict?

DEFENDANT: Not guilty of armed robbery and guilty of robbery. And I recently represented myself in Illinois in front of the judge in 702 in the criminal courts building on a motion.

THE COURT: You understand—you have a right to represent yourself. There's no question about that. You understand if you represent yourself, I'm going to hold you to the same standard as I would a lawyer?

DEFENDANT: Yes, I do.

THE COURT: That you're not going to be allowed to have a public defender stand by and help you in any fashion whatsoever.

DEFENDANT: Yes, I do, [Y]our Honor.

THE COURT: Okay. Then you can represent yourself."

¶ 5    After the trial court allowed defendant to appear *pro se*, defendant then made the following oral motion.

"DEFENDANT: Your [H]onor, at this time, I would be requesting that any 911 calls be saved, any police radio transmissions and apprehension and stopping of my van, I would be asking that all those police radio transmissions and any 911 calls made in regards to a burglary at 33 Jackson [*sic*]—

THE COURT: Were there any such calls?

POLICE OFFICER: From the victim, [Y]our Honor.

THE COURT: I'll sign an order preserving—

DEFENDANT: And the radio transmissions too, [Y]our Honor.

THE COURT: Sure. I'll sign an order to preserve anything transmitted relating to this case.

DEFENDANT: The calls on the radio transmission.

THE COURT: Sure."

¶ 6    The case was then set for the grand jury on May 6, 2011.  At that court date, the trial court informed defendant that he had been indicted by the grand jury.  Defendant asked again about the preservation of radio calls.

"DEFENDANT: Last time I requested [the] 911 [phone] calls and the police radio transmissions.  Can they be preserved?

THE COURT: Did you file an order? Did you file an order preserving them?

DEFENDANT: I asked you last time I was here.

4

THE COURT: No, I have to have a written order. An oral order is on the record, but I have to have a written record if you want to get it done. *** Let's send a blank order for him back there to fill it out."

¶ 7    On May 27, 2011, defendant appeared *pro se* before Judge Noreen Love for an arraignment. When the trial court asked who represented defendant, the following discussion occurred.

"DEFENDANT: I'm *pro se* at this time, [Y]our Honor.

THE COURT: I'm sure a lawyer was appointed in –

DEFENDANT: No.

THE COURT: No lawyer was ever appointed?

DEFENDANT: No. I asked to be *pro se* since the inception of the case.

THE COURT: So you've been intending to go *pro se* all along?

DEFENDANT: Yes, I have. I've been admonished three times by Judge Grossi. I have a motion for discovery I would like to submit at this time, and Judge Grossi—

THE COURT: Well, you're putting the cart before the horse. Because right now it's time for you to be arraigned on this matter. I cannot give you legal advice. You understand that?

DEFENDANT: Yes, Ma'am, I do.

THE COURT: And you understand that you're going to be held to the same standard as any other attorney would when you're

5

representing yourself?

DEFENDANT: Yes, I do.

THE COURT: You also understand that State's Attorneys are licensed, practicing attorneys. They have been to law school. They have to pass the bar in order to be in the position that they're in. Do you understand that?

DEFENDANT: Yes, I do.

THE COURT: How much education have you had, sir?

DEFENDANT: Currently a junior at Chicago State University upon my arrest.

THE COURT: Well, let me start first by asking you: Do you know what an arraignment is?

DEFENDANT: Yes.

THE COURT: Do you understand the procedure for an arraignment?

DEFENDANT: Yes, being notified of the official charges against me.

THE COURT: All right. Okay. Then I'm going to ask you this question: Do you want me to read to you the actual charges, or do you want to waive the reading of the charges; in other words, give up the right to have the charges read to you?

DEFENDANT: I'm giving up the right to hearing them read.

THE COURT: Okay. How are you pleading, sir, to each and every

charge? You do know what you're being charged with; is that

correct?

DEFENDANT: Yes, I do. Not guilty, and I'm also demanding

trial."

¶ 8     The trial court then discussed with defendant whether he was ready for trial that day

without having any discovery. The court also admonished defendant that it would not appoint

standby counsel for defendant and he would be on his own. Defendant indicated that he

understood. Defendant then presented the discovery order signed by Judge Grossi. The court

then discussed with defendant whether the order was sent to the appropriate parties, including the

Hillside police department. On that date, defendant also filed a handwritten motion for

discovery, asking the state's attorney to disclose and produce evidence which is essential and

material to the preparation of his defense, including but not limited to names and addresses of

State witnesses.

¶ 9     At a June 2011 court date, the State tendered discovery to defendant in court, including

the case report, photos, and the grand jury transcript. Defendant also moved for a bond

reduction. At the next court date in July, defendant discussed his motion for bond reduction,

indicating that he would reduce it to writing. He also asked about access to a disk with discovery

on it. At the following court date in August, the State tendered additional discovery to

defendant. The court also informed defendant that this case would proceed before the 2008 case.

Defendant withdrew his motion to reduce bond. Later that month, the court told defendant that

the State was setting up equipment to allow him to view a videotape in the courtroom.

¶ 10     At the following court date on September 7, defendant confirmed he viewed the video. The parties also discussed defendant's access to the law library. Defendant also indicated that he would be filing two motions, a motion to quash and a motion to obtain custody of all video and audiotapes to be played in the custody of all parties. Defendant discussed his concern that he wanted a copy of the record, noting that if he had an attorney, then his attorney would have a copy of the record. He did not want the State's Attorney's office holding his copy of the videotape. The court informed defendant he was responsible for subpoenaing his witnesses for the hearing on his motion to quash arrest and suppress evidence. Defendant indicated that he intended to subpoena the arresting officers.

¶ 11     Also, on September 7, 2011, defendant filed a written *pro se* motion to quash arrest and suppress evidence. Citing the United States Constitution and the Illinois Constitution, defendant argued that his April 18, 2011, arrest was "made without authority of a search warrant" and defendant's conduct prior to his arrest was "such as would not reasonably be interpreted by the arresting officers as constituting probable cause that [defendant] had committed or was about to commit a crime."

¶ 12     At the court date in October 2011, defendant stated that he had discussed subpoenas with the public defender, and would now like to discuss a subpoena for the 911 operator. In November 2011, the matter was set for hearing on defendant's motion. Defendant stated that he wanted to call the 911 operator. Defendant also discussed a stipulation of the 911 call, but was advised by the trial court that he was premature in seeking to admit evidence. Defendant later decided he needed to subpoena the arresting officers. At the court appearance in December 2011, defendant continued to discuss his intended witnesses for the suppression hearing. The

8

witnesses were not available that date. Defendant also informed the court that he was trying to ascertain additional witnesses for the defense, but did not know their names.

¶ 13    On January 20, 2012, the trial court conducted a hearing on defendant's suppression motion. At the start of the hearing, the prosecutor noted that Detective Anthony Milazzo, one of the police officers subpoenaed, was unable to appear due to a death in his family. The parties proceeded with the hearing.

¶ 14    Defendant called Joseph Beckwith to testify. Beckwith testified that he was employed as a dispatcher for the Village of Hillside. On April 18, 2011, Beckwith took a call about a burglary from the victim, Robert Fjeldheim. The caller stated that he returned home and saw a red van parked in his driveway. The caller described the offenders as two "bigger" black males. The men fled in the red van driving westbound on Madison. Beckwith relayed this information over the emergency radio. Based upon a preservation motion he made earlier, defendant had a recording of the call played during the hearing. The recording did not mention a red van or a break-in. Beckwith testified that the recording began in the middle of the call.

¶ 15    Beckwith stated that within seconds he received a dispatch from Chief Joseph Lukaszek and Detective Milazzo that they observed a red Chevy van on Wolf Road. Beckwith said that location was less than a mile from the location of the burglary. He remained in contact with the officers as they pursued the van. The officers saw the van make an illegal U-turn on Wolf Road to head northbound. The officers stopped the van after it turned onto Harrison Street, but then the van drove away and a chase ensued. The van later crashed and the occupants tried to run, but were taken into custody. Beckwith heard the officers state that proceeds from the burglary were found in the van.

¶ 16    Next, defendant called Chief Joseph Lukaszek to testify.  Chief Lukaszek stated that he was the chief of police for the Village of Hillside.  At approximately 11:04 a.m. on April 18, 2011, Chief Lukaszek was driving north on Wolf Road in an unmarked car with Officer Milazzo when he received a radio dispatch regarding a residential burglary.  He was alerted to look for a red Chevy van.  Approximately 10 seconds later, Chief Lukaszek observed a red van traveling south on Wolf Road.  He testified that the red van then made an illegal U-turn to drive north on Wolf Road.  Chief Lukaszek stated that the weather was overcast, but it was not raining that day. After he observed that illegal U-turn, Chief Lukaszek activated his vehicle's emergency lights and siren and pulled the van over after it had turned onto Harrison Street.  He approached the van on the driver side while Officer Milazzo approached the passenger side.  Both officers were in plain clothes, but had badges displayed.  Chief Lukaszek could not recall if he had his weapon out.  He identified defendant as the driver and said that he asked defendant for his driver's license.  Chief Lukaszek stated that defendant opened his door, looked at him, and then drove away.  He testified that defendant traveled eastbound on Harrison Street at a high rate of speed, in excess of 85 miles per hour (mph) in a 35 mph zone.  Defendant also ran three stop signs along Harrison Street.  The van turned into a mall parking lot, jumped a curb, drove down an embankment, and eventually crashed into a tree.  The van also spun and struck a dump truck. The occupants of the vehicle then attempted to flee on foot.  Defendant was stopped 300 to 400 feet from the crash.  Codefendant Love was stopped by officers from the Westchester police department.

¶ 17    Chief Lukaszek testified that property of Fjeldheim was found in the van.  Defendant was transported to 333 Jackson Boulevard, where Fjeldheim identified defendant as the person who burglarized his home and almost struck him with the vehicle.

¶ 18    Defendant then testified, in narrative form.  He stated that on April 18, 2011, he was legally driving on Wolf Road.  He saw a black Tahoe behind him with red and blue lights flashing in the windshield.  He said he did not hear a siren because it was raining and music was playing in the van.  He pulled over and two men exited the vehicle.  Defendant testified that the men were wearing street clothes and had weapons drawn.  One of the men called to throw the weapons out of the van.  Defendant denied having any weapons.  He said he rolled his window down two inches and said he did not have any weapons.  Defendant testified that he feared for his life and drove to a "populated" mall.  He said he parked at an angle in the parking lot, but the Tahoe hit his van and he slid down the embankment.  He stated that he did not know that Chief Lukaszek and Detective Milazzo were police officers.

¶ 19    On cross-examination, defendant testified that he and Love were driving on Wolf Road to look for a gas station.  Defendant said he was unfamiliar with the area.  The prosecutor asked defendant where he was coming from at that time, and defendant objected on relevance grounds.  The trial court overruled defendant's objection.  Defendant answered that he did not remember where he was coming from at that time.  He also said he was going to a friend's house and later testified they were going to a bowling alley to plan a group event.  The prosecutor asked defendant about gas stations in the area of Wolf Road, but defendant did not recall seeing them.  Defendant was asked if he had any of the proceeds from the burglary in his van, and defendant responded that he did not.

¶ 20    Following his testimony, defendant informed the trial court that he wanted to call Detective Milazzo.  The judge asked defendant if the detective's testimony would be cumulative since the detective was in the car with Chief Lukaszek.  Defendant responded that he did not know.  The State argued that defendant lacked standing to contest the search of the van because

he denied the presence of any evidence to suppress. Defendant rested and the State moved for a directed finding. Defendant argued that the police fabricated the dispatch that identified him and his vehicle and that there was no reason to stop his van. The trial court denied defendant's motion, finding that the police had sufficient probable cause to stop defendant after he made an illegal U-turn. The court said that the police had additional probable cause after defendant fled. In entering its findings, the court also noted defendant's "selective memory" since he could not recall gas stations or where he was coming from, but remembered there was a school nearby and testified that he fled to a populated area. At the conclusion of the suppression hearing, defendant requested counsel and the trial court appointed a public defender who represented defendant from that point forward until the conclusion of defendant's trial and sentencing. At subsequent court dates, defendant's counsel indicated that he had requested transcripts of the suppression hearing, and once he received a copy, he would review them with defendant.

¶ 21    In December 2012, the trial court conducted a joint bench trial for defendant and Love. Prior to the trial, the court noted that defendant had signed a written jury waiver. The court then confirmed that it was defendant's signature. The court admonished defendant that he was giving up his right to have a trial by jury and asked him if he knew what a jury trial was. Defendant responded in the affirmative to both inquiries.

¶ 22    Robert Fjeldheim testified that on April 18, 2011, he lived at 333 North Jackson Boulevard in Hillside. At approximately 11:04 a.m., he returned home from an errand. He observed a red van in his driveway and initially thought it belonged to his nephew and his friends. He parked his car and walked toward the van. He saw the van's headlights flash and the horn honked. He then heard a voice from inside the van say, "He is home." His back door then

flew open and he ducked. Fjeldheim then testified that Love grabbed his hood and tried to hit him on the head with a flashlight. He wrestled with Love and knocked the flashlight loose.

¶ 23    Fjeldheim testified that he heard someone in the house say, "Get his keys. Get his keys." Then defendant came charging out of the back door. When defendant ran past, Love let go of Fjeldheim and Fjeldheim ran toward the yard. The men got in the van and drove away, missing Fjeldheim by inches. He saw the van drive through his neighbor's yard, before traveling north on Jackson Boulevard and turning west on Madison Street. Fjeldheim then called 911. He described the assailants as two big black males.

¶ 24    When the police arrived at his house, Fjeldheim identified defendant and Love as the perpetrators. He also identified property from his house, including jewelry, photos, and business cards. Fjeldheim testified that he did not give permission to either man to enter his house or to take anything from it.

¶ 25    Detective Anthony Milazzo testified that at approximately 11 a.m. on April 18, 2011, he was a passenger in a vehicle driven by Chief Joseph Lukaszek. He received a call for a burglary at 333 Jackson Boulevard which mentioned a red van leaving the scene. The officers were driving near Wolf Road and Harrison Street, about half a mile from the burglary. Detective Milazzo stated that they saw a red van turning from southbound Wolf Road onto eastbound Harrison Street. The chief activated the police lights and effected a traffic stop of the van on Harrison Street.

¶ 26    Detective Milazzo testified that as they got near the back of the vehicle, it accelerated onto Harrison Street. The officers got back in the squad and pursued the van. He stated that the vehicle continued eastbound on Harrison Street "at a high rate of speed" and ran two or three stop signs. The vehicle then entered a mall parking lot. As it entered the parking lot, the vehicle

13

went over a curb, hit a tree going down an embankment, and went down near the ramp of the Interstate 290 expressway. Detective Milazzo identified defendant as the driver and Love as the passenger in the van. Both men tried to flee on foot. He and Chief Lukaszek pursued defendant and apprehended him. He later saw that Love had been apprehended by Westchester police.

¶ 27    After the men were apprehended, the officers searched the van. Detective Milazzo stated that they recovered a pillowcase full of items in between the front seats. He testified that the victim later identified those items as his property. The victim also identified both defendant and Love as the burglars.

¶ 28    The State also introduced a certified document from the Illinois Secretary of State that defendant was the owner of a 1999 Chevy van. The State rested. Both defendants moved for a directed finding, which the trial court granted as to attempted first degree murder and attempted armed robbery. Defendant rested without presenting any evidence. The trial court then found defendant guilty of residential burglary and aggravated fleeing or attempting to elude a peace officer.

¶ 29    At the subsequent sentencing hearing, the trial court found defendant eligible for a Class X sentence based on his prior felonies. Defendant's presentence investigation disclosed that defendant had 11 prior felony convictions dating back to 1985, including unlawful restraint in 1985, burglary in 1987, robbery in 1990, forgery in 1990, theft in 1990, robbery of a victim over 60 years old in 1994, aggravated battery in 1995, robbery in 1995, possession of contraband in penal institution in 1995, and attempted aggravated robbery in 2013. The court sentenced defendant to a term of 20 years for residential burglary and a concurrent term of 3 years for aggravated fleeing. The sentence imposed in this case was to run consecutive to a sentence imposed in an unrelated case.

¶ 30     This appeal followed.

¶ 31     Defendant first argues that the trial court's admonishments did not comply with Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) and therefore, his waiver of counsel was invalid. The State maintains that the trial court substantially complied with Rule 401(a) when it admonished defendant, and even if the trial court failed to properly admonish defendant, no reversible error occurred.

¶ 32     Initially, the State contends that defendant's claim of improper admonishments has been forfeited because he failed to raise the issue in the trial court either by objection or in a posttrial motion.  Defendant concedes that he did not object in the trial court, but asks this court to review this issue as plain error.

¶ 33     To preserve an issue for review, defendant must object both at trial and in a written posttrial motion.  *People v. Enoch*, 122 Ill. 2d 176, 186 (1988).  Failure to do so operates as a forfeiture as to that issue on appeal.  *People v. Ward*, 154 Ill. 2d 272, 293 (1992).  Supreme Court Rule 615(a) states that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded.  Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."  Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967).  The plain error rule "allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence."  *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)).  However, the plain error rule "is not 'a general

saving clause preserving for review all errors affecting substantial rights whether or not they have been brought to the attention of the trial court.' " *Herron*, 215 Ill. 2d at 177 (quoting *People v. Precup*, 73 Ill. 2d 7, 16 (1978)).  Rather, the supreme court has held that the plain error rule is a narrow and limited exception to the general rules of forfeiture.  *Id*.

¶ 34    Defendant carries the burden of persuasion under both prongs of the plain error rule. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009).  Defendant asserts that an invalid waiver of counsel falls under the second prong of plain error.  However, "[t]he first step of plain-error review is to determine whether any error occurred." *Id*.  We will review defendant's claim to determine if there was any error before considering it under plain error.

¶ 35    "It is well established that the sixth amendment to the United States Constitution guarantees an accused in a criminal proceeding both the right to the assistance of counsel and the correlative right to proceed without counsel." *People v. Haynes*, 174 Ill. 2d 204, 235 (1996) (citing *Faretta v. California*, 422 U.S. 806, 833-34 (1975)).  "The right of self-representation is 'as basic and fundamental as [the] right to be represented by counsel.' " *Id.* (quoting *People v. Nelson*, 47 Ill. 2d 570, 574 (1971)).   A defendant has the constitutional right to self-representation. *Faretta*, 422 U.S. at 834.  "Although a court may consider the decision unwise, a defendant's knowing and intelligent election to represent himself must be honored out of ' "that respect for the individual which is the lifeblood of the law." ' " *Haynes*, 174 Ill. 2d at 235 (quoting *People v. Silagy*, 101 Ill. 2d 147, 180 (1984), quoting *Illinois v. Allen*, 397 U.S. 337, 350-51 (1970) (Brennan, J., concurring)); see also *People v. Kidd*, 178 Ill. 2d 92, 104 (1997) (citing *People v. Lego*, 168 Ill. 2d 561, 564 (1995)).

¶ 36    "When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to

represent himself, the accused must 'knowingly and intelligently' forgo those relinquished benefits." *Faretta*, 422 U.S. at 835. "It is well settled that waiver of counsel must be clear and unequivocal, not ambiguous." *People v. Burton*, 184 Ill. 2d 1, 21 (1998). "Although a defendant need not possess the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of such representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open. [Citations.] The requirement of knowing and intelligent choice calls for nothing less than a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. [Citations.] The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances of that case, including the background, experience, and conduct of the accused." (Internal quotation marks omitted.) *Kidd*, 178 Ill. 2d at 104-05.

¶ 37    Illinois Supreme Court Rule 401(a) (eff. July 1, 1984), which governs the waiver of counsel, provides as follows:

> "Any waiver of counsel shall be in open court. The court shall not
>
> permit a waiver of counsel by a person accused of an offense
>
> punishable by imprisonment without first, by addressing the
>
> defendant personally in open court, informing him of and
>
> determining that he understands the following:
>
> > (1) the nature of the charge;
> >
> > (2) the minimum and maximum sentence prescribed
> >
> > by law, including, when applicable, the penalty to which

the defendant may be subjected because of prior

convictions or consecutive sentences; and

(3) that he has a right to counsel and, if he is

indigent, to have counsel appointed for him by the court."

¶ 38    Here, defendant contends that the trial court's admonishments did not comport with Rule 401(a)(2) (Ill. S. Ct. R. 401(a)(2) (eff. July 1, 1984)) because the trial court informed him of the sentencing range for a Class 1 felony, 4 to 15 years, rather than a Class X, 6 to 30 years, which defendant contends was applicable based on his own criminal history.  Defendant ultimately received a sentence of 20 years for residential burglary.  Defendant also contends the trial court failed to adequately apprise him of the nature of the charges.

¶ 39    "The purpose of this rule is 'to ensure that a waiver of counsel is knowingly and intelligently made.' " *People v. Campbell*, 224 Ill. 2d 80, 84 (2006) (quoting *Haynes*, 174 Ill. 2d at 241).  To ensure a valid waiver of counsel, substantial compliance with Rule 401(a) is required. *Id*.  There are numerous decisions, which we refer to later, discussing what substantial compliance means, but the supreme court has held that "substantial compliance will be sufficient to effectuate a valid waiver if the record indicates that the waiver was made knowingly and voluntarily, and the admonishment the defendant received did not prejudice his rights." *Haynes*, 174 Ill. 2d at 236; see also *Kidd*, 178 Ill. 2d at 104-05, *People v. Coleman*, 129 Ill. 2d 321, 333 (1989), and *People v. Johnson*, 119 Ill. 2d 119, 132 (1987).

¶ 40    Recently, Illinois Appellate Courts have described two methods to determine whether substantial compliance under Rule 401(a) has been met.  First, "[a]n otherwise inadequate admonition may be constitutionally sufficient, and therefore does not constitute error, if the absence of a detail did not impede the defendant from giving a knowing and intelligent waiver."

*People v. Pike*, 2016 IL App (1st) 122626, ¶ 113 (citing *People v. Black*, 2011 IL App (5th) 080089, ¶ 20). The second method is when "a defendant may be seen as possessing a degree of knowledge or sophistication that excuses the lack of admonition." *Black*, 2011 IL App (5th) 080089, ¶ 20.

¶ 41 In *People v. LeFlore*, the reviewing court's description of the two methods is slightly different. The *LeFlore* court held: To find substantial compliance, any deficiency to provide complete admonishments does not prejudice defendant because either: (1) " 'he was already aware of the information that was omitted' "; or (2) " 'his degree of legal sophistication made it evident that he was aware of the information that compliance with the rule would have conveyed.' " *People v. LeFlore*, 2013 IL App (2d) 100659, ¶ 52, *rev'd on other grounds*, 2015 IL 116799 (quoting *People v. Gilkey*, 263 Ill. App. 3d 706, 711 (1994)). The *LeFlore* court added, however: " 'the dispositive issue to be determined when deciding whether a waiver of counsel *** is valid is whether the waiver of counsel was knowingly, understandingly and effectively made, in light of the entire record.' " *Id.* (quoting *Gilkey*, 263 Ill. App. 3d at 711). Although all of these decisions may be helpful to our analysis, we conclude that whether there has been substantial compliance in any given case will depend upon the facts before us in light of the purpose of the rule we are called upon to interpret.

¶ 42 For the reasons that follow, we conclude that the trial court substantially complied with Illinois Supreme Court Rule 401(a); that defendant's waiver of counsel was knowingly and intelligently made; there was no plain error in the admonishments given; and, finally, if there was any error because of the lack of an admonishment, it did not amount to a plain and obvious error which denied defendant his fundamental right to a fair trial.

¶ 43    In determining whether there was substantial compliance with Rule 401, we detail the following: (1) the waiver occurred in open court where the trial judge specifically questioned defendant, (2) the court on April 19, 2011, detailed the nature of every charge to defendant by the following exchange:

> "THE COURT: All right.  We have a felony complaint here for residential burglary, another felony complaint for aggravated fleeing and eluding, and a misdemeanor complaint for assault.
>
> DEFENDANT: Your Honor.
>
> THE COURT: Hang on, sir.  Another misdemeanor complaint for resisting a peace officer.
>
> Sir, I will appoint the public defendant to represent you for the purposes of this bond hearing. Okay. So please speak to your attorney.
>
> State.
>
> PROSECUTOR: Judge, on April 18th, 2011 at approximately 11:04 a.m., at the home located at 333 Jackson Boulevard in Hillside, Cook County, Illinois, Judge, the owner of that home, the victim in this case, came home.
>
> He saw a van backed into his driveway.  He then discovered that his back door had been forced open and then saw this defendant and another co-defendant inside his home, Judge, carrying a pillow case.

20

The co-defendant attempted to strike the homeowner with a flashlight which was the homeowner's flashlight. Judge, the homeowner then ran from the scene at which time this defendant and co-defendant entered a van.

The van was driven by this defendant here, Judge. This defendant attempted to run over the homeowner with the van. The homeowner called 911, gave a description of that van, and that van was located in the 4700 block of Harrison Street.

The officers attempted to make a traffic stop. They were initially not successful. The defendant instead continued driving 21 miles over the speed limit violating three traffic signals and then ending up driving off the roadway and crashing, Judge.

The defendant didn't stop there, but he got out of the van and fled on foot. He was eventually apprehended, and the homeowner positively identified this defendant, the co-defendant, and the items that were in that pillow case, Judge."

¶ 44    Thereafter, the prosecutor referenced defendant's criminal background as the following:

"He has a 1995 aggravated battery, great bodily harm, two years Illinois Department of Corrections; 1992 armed robbery and aggravated kidnapping, there was a finding of not guilty; 1993, robbery, ten years IDOC; 1990 robbery, three years IDOC; 1989 forgery, two years IDOC; 1987 burglary, four years probation; 1984 aggravated criminal sexual assault, two years IDOC."

The State then asked for a $750,000 D bond. The public defender informed the court that defendant was 44 years old, and currently a business major at Chicago State University. The judge then set a $400,000 D bond.

¶ 45    Three days later on April 22, 2011, defendant appeared before another judge to set a date for the return of an indictment. Defendant immediately informed the court that he was representing himself, stating that he was "very familiar with the law" and was "exercising [his] constitutional right." Defendant continued to assert his right immediately after he was advised that he was charged with a felony, residential burglary, and the court told defendant to, "Slow down. We are not done yet." The trial court then accurately stated the minimum and maximum sentence for residential burglary, which is 4 to 15 years. See 720 ILCS 5/19-3(b) (West 2010); 730 ILCS 5/5-4.5-30(a) (West 2010). The court questioned the defendant extensively about his waiver of the right to counsel, including inquiries as to defendant's education, any experience he had previously in representing himself, and whether he had been charged with a felony before. Defendant responded that he had previously been charged with a felony, and then detailed his representation from a prior conviction in 1994 in which defendant received what he described as a "split verdict." As we detail later, this was accurate information because in that case defendant was found not guilty of armed robbery in one case, but guilty of robbery of a victim over 60 years old. The judge advised defendant that although he had the right to represent himself, the defendant would be held to the same standards as an attorney and that the defendant would not have a public defender to stand by and help him with his case. From the above, we conclude the trial judge advised defendant of the dangers and disadvantages of self representation. See *Kidd*, 178 Ill. 2d at 104-05.

¶ 46      The trial court's statement that defendant was facing 4 to 15 years was partially correct, and we acknowledge there was no discussion at that hearing regarding the possibility that upon conviction of residential burglary defendant was subject to be sentenced as a Class X offender. In fact, at defendant's initial bond hearing, the State's Attorney's office did not indicate defendant was Class X eligible, nor was it apparently aware that defendant had recently served 27 years in the penitentiary for a robbery conviction.

¶ 47      The record also shows that the court had previously appointed a public defender on the first court date and the public defender appeared on behalf of defendant when he indicated that he wanted to represent himself.  Based upon all of the admonitions given, the discussions between the court and defendant, and accepting the claim that the trial court should have admonished defendant about the possibility of his Class X status, although there was not strict compliance, we find there was substantial compliance with Illinois Supreme Court Rule 401.

¶ 48      At the April 22, 2011 court date, defendant followed his request to proceed *pro se* with a verbal request that "any 911 calls be saved, any police radio transmissions and apprehension and stopping of [his] van" also be preserved.  The court agreed to sign an order.  Defendant appeared before this judge about two weeks later and followed up on his discovery request.  The court informed defendant that he needed a written order to enforce his request to preserve 911 calls.  In May 2011, defendant filed a written motion for discovery which was legible and cited the fifth, sixth, and fourteenth amendments to the United States Constitution (U.S. Const., amends. V, VI, XIV), article I, section 2 of the Illinois Constitution (Ill. Const. 1970, art. I, § 2), multiple statutes from the Code of Criminal Procedure of 1963 (725 ILCS 5/101-1 *et seq.* (West 2010)), and four Illinois Supreme Court Rules.  He sought the names and last known addresses of persons the State intended to call as witnesses with their statements, any written or recorded statements and

23

the substance of any oral statements by the accused or a codefendant, a grand jury transcript, any reports or statements of experts made in connection with the case, any book, papers, documents, photographs, or tangible objects the State intended to use at trial, any record of prior criminal convictions which may be used for impeachment for persons the State intends to call at trial, information as to whether there has been any electronic surveillance of conversations, and any material or information within the State's possession or control which "leads to negate the guilt of the accused as to the offense charged or would tend to reduce his punishment therefore." Defendant asked for an opportunity to inspect, obtain, test, copy, or photograph any evidence.

¶ 49    At the next court date, before a third judge, who ultimately presided over the case, defendant again asserted his desire to appear *pro se*. Defendant stated that, he "asked to be *pro se* at the inception of the case." He informed the court that he was admonished by the prior judge "three times." He asked to submit a motion for discovery. The trial judge also explained to defendant that she could not give him legal advice, that defendant would be held to the same standard as any other attorney, and that the State's Attorneys were licensed, practicing attorneys who had attended law school and passed the bar exam. Defendant responded that he understood. The trial court asked defendant if he knew what an arraignment was, and he said he understood what an arraignment was. Specifically, defendant said that it meant "being notified of the official charges against me." Defendant then waived reading of the charges against him and demanded trial.

¶ 50    Defendant continued to represent himself at 10 more court dates, including the hearing on his motion to suppress. We specifically note that defendant's *pro se* handwritten motion to suppress was properly formatted, raised legitimate claims, and cited proper legal authority for his claims, including the exclusionary rule set forth in *Mapp v. Ohio*, 367 U.S. 643 (1961), the fourth

amendment (U.S. Const., amend. IV), and article I, section 6 of the Illinois Constitution (Ill. Const. 1970, art. I, § 6). We also note that at the suppression hearing, defendant attempted to impeach Beckwith, the 911 operator, with the transcript of the audio recording, which did not contain all the information Beckwith disclosed in his testimony. While his motion was ultimately unsuccessful, defendant's motion demonstrated his degree of legal sophistication. Immediately after the denial of his motion to suppress, defendant requested counsel and a public defender was appointed. These court proceedings further demonstrate that there was substantial compliance with Rule 401(a). Next, we decide whether that defendant's waiver of counsel was made knowingly and intelligently based upon the record before us.

¶ 51 We find the decision in *People v. Herndon*, 2015 IL App (1st) 123375, which is factually similar to the case at bar, supports our analysis. In that case, the defendant was charged with two counts of delivery of a controlled substance. He was initially appointed a public defender, who represented the defendant at a hearing on a motion to suppress, which was denied. Less than two weeks later, the defendant sought to represent himself. The trial court admonished the defendant and gave him a week to consider his decision. A week later, the defendant asked for the appointment of a different public defender, which the trial court denied, and then the defendant elected to proceed *pro se*. *Id*. ¶¶ 3-7. In the following weeks, the defendant "filed several motions, including discovery motions, a motion to dismiss indictment, a motion to quash arrest, and a motion to suppress video evidence over the next several court dates." *Id.* ¶ 8. More than a year after the defendant had opted to represent himself, he requested an attorney. The court appointed counsel, who then represented the defendant through trial and posttrial motions. *Id.* ¶¶ 10-20. At sentencing, the defendant disputed his Class X status and asked to again appear *pro*

*se*, and was admonished of the dangers of appearing *pro se*. *Id.* ¶ 20. The defendant was sentenced to 10 years as a Class X offender. *Id.*

¶ 52 On appeal, the defendant argued that the trial court failed to comply with Rule 401(a) by failing to inform him of the nature of the charges and that he was subject to Class X mandatory sentencing. *Id.* ¶ 26. The reviewing court observed that the defendant had been fully notified of the charges pending against him at the arraignment and his suppression hearing and both took place when he was represented by counsel. *Id.* ¶ 27. The court then made the following findings.

> "Defendant has experience in the criminal justice system and admittedly has a 'very extensive' criminal background. His criminal background includes a conviction for a nearly identical offense of possession of a controlled substance with intent to deliver in 2000. Defendant had five other narcotics convictions, two firearm related convictions and a burglary conviction.
>
> Furthermore, when defendant represented himself during pretrial proceedings he made numerous discovery requests. As part of the discovery process, defendant had an opportunity to inspect the 1505 fund sheets, which showed the currency with prerecorded serial numbers used in investigations, the narcotics and the video of the transaction that was later used at trial. In addition, defendant filed three pretrial motions. He also filed and argued three motions: a motion to dismiss the indictment based on the fact that the funds used in the undercover buy were never

recovered, a motion to quash arrest on the basis that he was not arrested at the address listed on the search warrant and a motion to suppress the video evidence.

With all of this in mind, including the fact that defendant was represented by counsel several months before trial, during trial and throughout sentencing, we cannot say that defendant was not aware of the nature of the charges, or that the trial court failed to inform defendant of the nature of the charges against him during the short time that defendant proceeded *pro se* during the pretrial stage such that substantial compliance with Rule 401(a) was not accomplished." *Id.* ¶¶ 28-30.

¶ 53     The defendant in *Herndon* also asserted that he was not admonished in substantial compliance with Rule 401(a)(2). Specifically, he argued that the trial court did not inform him of the potential sentencing range. *Id.* ¶ 31. The reviewing court found substantial compliance, noting that on the date the defendant indicated he wished to represent himself, the prosecutor stated the defendant was subject to extended term sentencing of 15 to 30 years based on his background. Although the defendant was not told he was Class X mandatory, he was advised of the minimum and maximum sentencing range, and the appellate court concluded no error occurred. *Id.* ¶¶ 32-33.

¶ 54     We note several other Illinois decisions which have held that the trial court's failure to *strictly* comply with the admonition of the minimum and maximum sentence did not warrant a reversal of the defendant's conviction where the record clearly revealed that defendant knowingly and intelligently waived his right to counsel based on his extensive legal experience and

knowledge of the law.  See *People v. Eastland*, 257 Ill. App. 3d 394, 399-400 (1993) (the defendant "exhibited a high degree of legal sophistication perhaps gained from his presence throughout these proceedings, if not also his criminal history, so that his waiver of counsel was made knowingly and intelligently");  *People v. Meeks*, 249 Ill. App. 3d 152, 172 (1993) ("Defendant has previous convictions, substantial experience with the legal system, and filed over 15 thorough *pro se* petitions and motions that included extensive case law. Moreover, defendant asserted that he had 20 years' experience with the law. Under these circumstances, we conclude that there was no violation of Rule 401(a).");  *People v. Black*, 68 Ill. App. 3d 309, 313 (1979) ("Considering defendant's prior experiences with armed robbery convictions and his familiarity with criminal law, there is no question that defendant knew that he could receive a lengthy prison sentence upon conviction. Nevertheless, defendant, well aware of the potential punishment, remained adamant in demanding to represent himself after repeatedly requesting the dismissal of the court appointed counsel."); *People v. Jackson*, 59 Ill. App. 3d 1004, 1009 (1978) ("Defendant was no stranger to criminal proceedings. In fact he was quite familiar with them. His conduct of the defense demonstrated his intricate knowledge of court proceedings and his familiarity with court records. This knowledge was demonstrated by defendant's skillful but unavailing attempt to claim he had already been discharged of the burglary offense. The record shows, as the defendant stated to the court, he thought he could defend himself better. Considering the entire record, we conclude defendant knowingly and intelligently waived his right to counsel."); *People v. Smith*, 33 Ill. App. 3d 725, 728 (1975) ("We believe the record evidences adequate compliance with the requirements of the rule.  Defendant had earlier been represented by retained counsel and by the public defender; he discharged both.  The court admonished him of the seriousness of the charges, that they involved felonies for which he could

be incarcerated in the penitentiary. Defendant represented to the court that he had 'quite a bit of study in law' and that matters he had brought out on the previous trial, 'which some people considered prejudicial to his case,' was 'part of his strategy' and had resulted in a mistrial. This time, he assured the judge, it will be different. He asserted that he knew his case better than any lawyer and wanted none sitting at counsel table with him in any capacity. He expressly invoked his constitutional right to defend himself. While the record does not disclose that the court expressly stated the potential minimum and maximum terms for the alleged offenses, we think it plain that defendant's waiver of counsel was made knowingly and voluntarily and there is no claim made that defendant was actually unaware of the potential penalties.").

¶ 55    In *People v. Phillips*, 392 Ill. App. 3d 243, 262-63 (2009), the defendant argued that the trial court did not substantially comply with Rule 401(a) because at the time of his waiver of counsel, the court failed to inform him of the nature of the charge and that he had the right to counsel and one would be appointed if the defendant was indigent. The reviewing court found substantial compliance because (1) the defendant had been fully admonished nine months earlier; (2) the record did not suggest that defendant failed to understand the charges against him; (3) the defendant had been represented by counsel so he understood his right to counsel and to have one appointed; and (4) the defendant had extensive history with the criminal justice system. *Id.* at 263-64. The court also pointed out that the defendant did not claim that he suffered any prejudice or that he would have acted differently had additional admonishments been made. *Id.* at 263 (quoting *People v. Johnson*, 119 Ill. 2d 119, 134 (1987)); see also *Kidd*, 178 Ill. 2d at 114 ("There is no suggestion in the record that the trial court's misstatement concerning either the charge of aggravated arson or the minimum sentence played any part whatever in defendant's waiver of his right to the assistance of counsel.").

29

¶ 56    Further, the supreme court has found substantial compliance in multiple cases in which the defendant was misinformed about the minimum sentence. See *Kidd*, 178 Ill. 2d at 114 (finding substantial compliance by "informing defendant of the nature of the charges against him, explaining to him that the death penalty was the maximum sentence, and advising him of his right to counsel" despite incorrect admonishment regarding one of the charges and the minimum sentence); *Haynes*, 174 Ill. 2d at 243 (substantial compliance when the defendant informed of minimum and maximum sentences for murder charge, but not for lesser burglary charge); *Coleman*, 129 Ill. 2d at 333 (the trial court incorrectly informed the defendant that the minimum sentence was 20 years, rather than natural life); *Johnson*, 119 Ill. 2d at 133-34 (finding no prejudice to the defendant when not informed that the minimum sentence was life when he was told that the maximum sentence was the death penalty).

¶ 57    The same conclusion can be reached regarding defendant in this case. Defendant has an extensive criminal background, including a 1987 conviction for burglary, a 1994 conviction for robbery of a victim over 60 years old, a 2013 conviction for attempted aggravated robbery, and several other offenses. Defendant represented himself for at least part of the proceedings for the 1994 and 2013 convictions. Defendant filed multiple motions in this case, including to preserve 911 calls and to quash his arrest and suppress evidence. Defendant was also represented by counsel for a period of time prior to trial, during trial, and posttrial. Nothing in the record suggests that defendant's decision to waive counsel and represent himself was not knowing and voluntary. Defendant has not argued on appeal that his waiver was not knowing and voluntary. He has not claimed that he suffered any prejudice as a result of the denial of his motion to suppress or any other prejudice he suffered as a result of the incomplete admonishment. Although defendant voluntarily chose to represent himself for the pretrial motion, defendant was

represented by counsel immediately after the denial of his motion to suppress and through trial, posttrial, and sentencing. This record firmly establishes that defendant knowingly and voluntarily waived his right to counsel, he did not suffer any prejudice as a result of his self-representation for the time he did so, and had the legal sophistication to understand his rights, we find without question that the purpose of Rule 401(a) was satisfied.

¶ 58 Moreover, were we to ignore defendant's high degree of legal sophistication, we would still conclude that his waiver was both knowing and voluntary because of his significant and rather lengthy criminal history. Defendant previously represented himself at trial in an earlier prosecution and received what he calls a "split verdict." In that case, defendant was charged in two separate cases, but the charges were tried jointly; one was for armed robbery and the other for robbery of an individual over 60 years of age, involving the same victim for crimes that occurred at the same location two weeks apart. *People v. Maxey*, No. 1-95-0885 (Mar. 14, 1997) (unpublished order under Supreme Court Rule 23).

¶ 59 Defendant was initially represented by counsel, but the day before the jury trial, defendant asked to appear *pro se*. The trial court admonished defendant, but defendant maintained that he wanted to represent himself. The next day, defendant requested counsel other than the public defender. The court granted defendant a continuance to retain private counsel. Defendant later told the court that he was unsuccessful in obtaining money from his family, and a private attorney was appointed. Later, defendant's attorney informed the court that defendant wished to appear *pro se* and refused the court's offer to have counsel stand by and assist him. *Maxey*, slip order at 2-3.

¶ 60 The evidence at trial showed that in November 1992, defendant entered a leather cleaning shop on North Dearborn Street in Chicago. The victim was working at the store. Defendant

31

threatened the victim with scissors to his neck, took the victim to the back of the store, and bound him with a telephone cord. Defendant took the victim's keys, money from the cash register, and left wearing a customer's leather jacket with other coats in a bag. Two weeks later, defendant returned to the same store, wearing the stolen leather jacket. Defendant tried to put the victim in the back of the shop again, but the victim resisted and triggered a silent alarm. Defendant again tied up the victim. Defendant pulled the victim's pants down looking for money and bit the victim's arm. The police arrived as defendant was trying on more garments. *Maxey*, slip order at 3-5. The jury found defendant not guilty of armed robbery for the first date, and guilty of robbery of a victim over 60 years of age for the second date. *Maxey*, slip order at 5-6.

¶ 61    Defendant appeared *pro se* on his posttrial motions, which motions the trial court denied. At sentencing, the State presented certified copies of defendant's conviction for burglary in 1987 and robbery in 1990 as well as his history of other offenses. There, the trial court specifically found that defendant was Class X mandatory based on his criminal history and sentenced defendant to 27 years in prison. *Maxey*, slip order at 6-7.

¶ 62    The State has filed a motion requesting this court to take judicial notice of relevant portions of the record in another of defendant's cases, specifically defendant's 2008 case for attempted aggravated robbery, which we do. In that case, defendant also represented himself *pro se* at a suppression hearing. *People v. Maxey*, 2011 IL App (1st) 100011, ¶ 4. During the course of the hearing, the trial court advised defendant that he needed the assistance of an attorney to properly present his motion. Defendant agreed and requested counsel. The hearing was then continued for several months. *Id.* ¶¶ 4-11. Ultimately, the trial court granted defendant's motion to suppress after the continued hearing, but on appeal, another division of this court reversed. *Id.* ¶ 78. While the appeal in the 2008 case was pending, defendant was arrested and charged in the

current case. Defendant was found guilty in this case in December 2012. In January 2013, prior to sentencing in this case, defendant pled guilty to attempted aggravated robbery in the 2008 case and received a sentence of 11 years. Subsequently in February 2013, defendant was sentenced in the instant case.

¶ 63    During the court proceedings on November 26, 2008, in that other case, defendant stated that he was exercising his sixth amendment right to represent himself *pro se* because he "just feel[s] more comfortable that way." Defendant informed the trial court that he had done it before, again referencing the "split verdict" from the 1992 cases. Defendant demanded trial and said he had two motions to file. The trial court then admonished defendant to make sure he understood the charges and possible penalties. The prosecutor in those proceedings pointed out that defendant was Class X mandatory. The court continued, stating that defendant was charged with Class 2 felonies, but based on his background, the sentencing range would be Class X, which is 6 to 30 years. Defendant stated that he understood each of these admonitions.

¶ 64    At a subsequent court date in December 2008, defendant appeared before a different trial judge, who asked defendant whether he wished to be represented by the public defender, and defendant responded no. Defendant informed the court he received incomplete discovery from the State and he asked for the appointment of an investigator. The court admonished defendant again that he was Class X mandatory, and defendant said he had already waived counsel before a different trial judge.

¶ 65    During subsequent appearances, defendant presented discovery requests and consistently followed up on his requests. At a January 2009 court date, the trial court asked about defendant's criminal background, and defendant responded that he was "Class X mandatory." Defendant detailed his trial plan, that he had almost located his witnesses and would be "tendering

33

discovery to the State within a month," but asserted his need for 911 tapes that "were material to [his] defense." Defendant also asked about his vehicle, if it was "seized as evidence." In March 2009, defendant asked about submitting a motion for counsel other than the public defender, noting that he does not have "a right to perfect counsel."

¶ 66    In July 2011, on remand following this court's reversal of the grant of the motion to suppress, defendant expressed his desire to represent himself. Defendant stated that he was "very familiar" with the criminal justice system. Defendant continued to appear *pro se* in the 2008 case. In a June 2012 court date, the trial court noted that defendant had waived counsel "on at least three separate occasions in connection with these proceedings," but as trial was approaching, defendant stated that he was "overwhelmed" and needed counsel. At some point counsel was appointed, as indicated by the case history detailed in a subsequent appeal. *People v. Maxey*, 2015 IL App (1st) 140036, ¶ 14.

¶ 67    Defendant's history shows that he has chosen to represent himself frequently and at other times he has had an attorney represent him when he so chooses. In the instant case, defendant immediately requested an attorney after his motion to suppress was denied. Defendant has a significant understanding of the criminal justice system and has used the services of the public defender when it has served his purposes. Thus, he has knowingly and voluntarily waived his right to counsel on several other occasions. More important, even if we did not consider the transcript from his other case, the record still demonstrates that defendant knowingly and voluntarily chose to represent himself through the suppression hearing. Nothing in this record suggests that defendant was prejudiced or would have changed his mind about appearing *pro se* if the trial court had admonished defendant that he was possibly facing a sentence of 6 to 30 years. *Phillips*, 392 Ill. App. 3d at 263 (quoting *Johnson*, 119 Ill. 2d at 134).

¶ 68     Defendant relies on the Second District decision in *LeFlore* to support his contention that the trial court failed to comply with Rule 401(a). In *LeFlore*, the defendant waived the right to counsel after the denial of a motion to suppress, and represented himself at trial. At the time of his waiver, the trial court admonished him that he was charged with aggravated robbery and subject to a term of 4 to 15 years in prison. *LeFlore*, 2013 IL App (2d) 100659, ¶ 9. However, at sentencing the State presented copies of certified convictions establishing that defendant was Class X mandatory and subject to 6 to 30 years in prison. *Id.* ¶ 10. On appeal, the defendant argued that the trial court failed to comply with Rule 401(a) by not admonishing him of his Class X mandatory sentencing range. *Id.* ¶ 50. The reviewing court found that the record did not show the defendant had any degree of legal sophistication such that it was evident that he was aware of the sentencing range. *Id.* ¶ 57.

> "When defendant informed the trial court that he wished to discharge his attorney and proceed *pro se*, the trial court asked defendant if he had any history, background, or familiarity 'with the criminal system regarding particulars of going to trial and issues of evidence in a criminal trial.' Defendant answered that he had 'somewhat some [*sic*],' but, when asked to what extent, he responded, 'Not much.' Defendant explained that he had been 'through a few trials' and told the court that he 'went through *pro se*' on his most recent charge, for attempted burglary. When asked if it was a bench or a jury trial, defendant explained that '[i]t didn't get that far,' that he 'decided to take the plea' that 'was brought to me from the judge herself.' He stated that he had brought some

pretrial motions in that case and had done some legal research.

That was the one case that defendant could remember that

provided him with familiarity with the criminal system." *Id.*

¶ 69      As we have detailed, defendant in this case was extremely sophisticated, and clearly had

the requisite legal knowledge of his Class X mandatory status.  For this reason, we find *LeFlore*

distinguishable, where the defendant there could not articulate his prior experience with the

criminal justice system, something this defendant expressly did.  Further, we point out that the

defendant in *LeFlore* represented himself at trial, while defendant in the instant case was

represented by counsel at trial and sentencing.

¶ 70      Contrary to defendant's assertion, the *LeFlore* court did not make a blanket statement that

a defendant's criminal history cannot support a finding of substantial compliance, but rather, held

that under the facts of that case, the record did not support such a result.  The same is not true in

this case, where the record clearly shows both: that the omission (lack of admonishment) did not

impede defendant's knowing and voluntary waiver, and second, defendant "possess[ed] a degree

of knowledge or sophistication that excuse[d] the lack of admonition." *Black*, 2011 IL App (5th)

080089, ¶ 20.  Since we conclude defendant knowingly and voluntarily waived his right to

counsel, and possessed the requisite legal knowledge which satisfied both tests, we find the other

cases relied on by defendant to be distinguishable.  See *People v. Wright*, 2015 IL App (1st)

123496, ¶ 56, *appeal allowed*, No. 119561 (Nov. 25, 2015) (the reviewing court declined to

"assume that defendant knew or should have known the maximum penalty because he

intelligently argued his case" where the "defendant appeared to possess somewhat of a high level

of legal sophistication, we do not believe that this made his knowledge of the maximum sentence

evident");  *People v. Bahrs*, 2013 IL App (4th) 110903, ¶ 46 (after being represented by counsel,

the defendant opted to appear *pro se* at posttrial hearings and sentencing, but was not admonished regarding the consecutive nature of his potential sentences and the defendant lacked "a high degree of legal sophistication"); *People v. Koch*, 232 Ill. App. 3d 923, 927 (1992) (where the defendant appeared *pro se* during plea proceedings in which he was inaccurately informed of his maximum sentence and subsequently received a greater sentence, the reviewing court found that "the record before [it] does not reveal that defendant had the unusual and demonstrable legal sophistication").

¶ 71     After considering the record in this case, as well as defendant's prior cases, it is clear that defendant knew he was Class X mandatory.  Defendant's history shows that he had been sentenced as a Class X offender after his 1994 conviction, and he stated on the record in his 2008 case that he knew he was Class X mandatory before the Rule 401 admonishments were given in this case.  Additionally, when arrested for this charge, defendant had recently completed a 27-year sentence for a 1994 robbery conviction, although, as pointed out above, this fact was not apparent to anyone during the April 2011 court proceedings.  It is more than obvious that defendant was again facing very significant penitentiary time if convicted of the charged offenses.  See *Black*, 68 Ill. App. 3d at 313.

¶ 72     By our decision today, we do not mean to suggest that trial judges should not comply with supreme court rules.  Compliance is mandatory.  See *Campbell*, 224 Ill. 2d at 87.  Further, complete admonishments are the rule and we encourage judges to go above and beyond that which is required.  However, the trial judge did go beyond the rule and asked defendant about his education, his background, and whether he had represented himself before in the trial court.  The trial judge correctly informed defendant of the 4 to 15 year sentencing range for residential burglary, the most serious charge pending at that time.  Three days before defendant's April 22

appearance, the defendant was fully admonished of the nature of the charges and a public defender was appointed to represent him. The judge also noted that defendant would be held to the same standard as a lawyer and that defendant would not have the benefit of a public defender to assist him. The trial court also went out of its way to make sure defendant was able to obtain 911 calls and police radio transmissions in this case. Finally, when defendant appeared before the trial judge who presided over the case, defendant again persisted in his desire to appear *pro se*. This judge also admonished defendant regarding the disadvantages of representing himself, including that the court could not give him legal advice, defendant would be held to the same standard as a lawyer, and that the assistant State's Attorneys attended law school, passed the bar, and were licensed attorneys. The trial judges in this case ensured that defendant was aware of the reality and consequences of representing himself. See *Faretta*, 422 U.S. at 835 (holding that when a defendant chooses to represent himself, " 'he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open' " (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)).

¶ 73      Without much analysis, defendant suggests that because the court incorrectly admonished him, and he subsequently received a sentence of 20 years, plain error occurred. Contrary to this suggestion, it is clear that the sentence imposed in this case was not in any way based upon a waiver of counsel, but based upon the subsequent finding of guilty of the charges and defendant's extensive criminal history, including the following felonies: unlawful restraint in 1985, burglary in 1987, robbery in 1990, forgery in 1990, theft in 1990, robbery of a victim over 60 years old in 1994, aggravated battery in 1995, robbery in 1995, possession of contraband in penal institution in 1995, and attempted aggravated robbery in 2013. Defendant's background also indicates that

he was 45 years old at the time the 20-year sentence was imposed. The trial court explicitly noted defendant's extensive history before imposing the sentence. His self-representation which lasted for only a small part of these proceedings and the denial of his motion to suppress had no bearing on the sentence imposed, and defendant has not established otherwise. There has been no error. Because there is no error, there can be no plain error. See *Lewis*, 234 Ill. 2d at 43.

¶ 74    We also point out that finding an error has occurred (were we to do so) does not mean that the second prong of plain error test has been met and that relief would automatically be awarded. Rather, the burden would then be on defendant to show that the error was plain and obvious, and it was so serious "that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Herron*, 215 Ill. 2d at 187. Defendant has not established plain error. Defendant has not demonstrated that the lack of any admonishment affected the fairness of his trial and challenged the integrity of the judicial process. More specifically, we find based upon our review of the hearing on defendant's motion to suppress, defendant has not demonstrated that the failure to admonish him would have impacted the court's ruling on the motion to suppress. Therefore, defendant has not established plain error such that it did not deny him the right to a fair trial.

¶ 75    Although the dissent suggests there was no substantial compliance with Illinois Supreme Court Rule 401, because defendant was not advised of the possible penalty of 6 to 30 years, it does not consider what defendant was advised of before the trial judge accepted defendant's waiver of counsel. It also disregards all of the proceedings surrounding defendant's waiver. The dissent focuses upon one portion of the rule's provisions, and, concludes there can be no compliance under these facts. The dissent also misapplies the plain error doctrine in the context of a claim of an incomplete admonishment under Illinois Supreme Court Rule 401. It is not

39

enough to say the failure to admonish the defendant of the possible sentence of 6 to 30 years amounts to plain error, or to conclude that defendant was denied his right to counsel without reviewing the entire record of proceedings.

¶ 76    Most of the cases relied upon and cited by the dissent do not involve plain error review, specifically, *Bahrs*, *Kidd*, *Campbell*, *Coleman*, *Haynes*, and *Johnson*; although in one of those cases, the *Johnson* case, the Illinois Supreme Court initially mentioned that the defendant did not preserve the error for review. *Johnson*, 119 Ill. 2d at 131.  Other than the *Johnson* case, not a single supreme court case cited by the dissent actually considered the issue of substantial compliance with Rule 401 within the context of plain error.  As already noted, the *Johnson* court found substantial compliance with Rule 401.  *Id.* at 132.

¶ 77    Plain error review is a narrow and limited exception to general forfeiture principles only after a reviewing court has concluded that an error has occurred, does the reviewing court go on to determine whether the defendant has established that the plain and obvious error infected the entire proceedings so as to deny the defendant his fundamental  right to a fair trial. See *People v. Thompson*, 238 Ill. 2d 598, 613-14 (2010) (finding that the supreme court cannot presume a biased jury because the trial court erred in questioning the venire under Illinois Supreme Court Rule 431(b)); *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009 (discussing automatic reversal for structural errors, "a systemic error which serves to 'erode the integrity of the judicial process and undermine the fairness of the defendant's trial' " (quoting *People v. Herron*, 215 Ill. 2d 167, 186 (2005)).   This is not such a case.

¶ 78    Every single case cited by the dissent cannot only be distinguished on its facts, but can be squarely reconciled with the decision we have reached here. For example, in *People v. Brzowski*,

2015 IL App (3d) 120376, ¶ 45, the "trial court failed to provide defendant with any of the required admonishments" set forth in Rule 401. That is not what occurred here.

¶ 79    In *Black*, 2011 IL App (5th) 080089, ¶ 14, although a plain error case, the trial judge again failed to give any admonitions to the defendant prior to accepting the defendant's waiver of counsel. Again, that is not what occurred here.

¶ 80    In *Bahrs*, 2013 IL App (4th) 110903, ¶ 14, again not a plain error case, the appellate court decision was based in part upon a defendant's waiver of counsel just before sentencing, in which the trial court failed to advise the defendant that he was subject to consecutive sentencing. Thereafter, rejecting any request from the defendant that the sentencing hearing be continued or that defendant be permitted to file a motion to reconsider the guilty finding, the trial court proceeded immediately to impose an additional 3-year consecutive sentence to a 30-year prison term for an aggravated driving under the influence conviction. *Id.* ¶¶ 7-10. The appellate court painstakingly discussed numerous supreme and appellate court decisions concerning Rule 401, and acknowledged the case before it was not the unusual case in which the defendant had any degree of legal sophistication. *Id.* ¶ 46.

¶ 81    In *Campbell*, 224 Ill. 2d at 84, the supreme court found there was no compliance, substantial or otherwise, with Illinois Supreme Court Rule 401. There were no admonishments made in *Campbell*, none; hardly an analogous case and again one which did not involve plain error review.

¶ 82    In *People v. Vernón*, 396 Ill. App. 3d 145, 150 (2009), when the appellate court said that the deprivation of the right to counsel is a "classic area of plain-error review," this statement was only partially correct because that statement only references the first half of second prong plain error review. Necessary, however, to warrant relief under this prong is the requirement that the

plain and obvious error must have infected the entire proceedings so as to deprive a defendant of his fundamental right to a fair trial. Additionally, we agree with the appellate court decision in *Vernón*. A complete review of that decision discloses that again no admonitions were made before the defendant waived counsel and before the defendant proceeded on his *pro se* motion to dismiss the charges. The trial court also accepted the defendant's jury waiver by merely asking the defendant if it was "voluntary." *Id.* at 146-47. These facts clearly warranted reversal of the defendant's conviction of a misdemeanor offense.

¶ 83    In *People v. Allen*, 220 Ill. App. 3d 772, 781 (1991), the court did not review any waiver of counsel issue, the decision concerned whether the defendants were prejudiced by their attorney's lack of effective representation of them at trial.

¶ 84    Although the dissent suggests *LeFlore* is identical to the facts here, we must disagree. We have already distinguished *LeFlore* above, but there the appellate court reversed the trial court's denial of the defendant's motion to quash an arrest, in addition to finding the trial court failed to substantially comply with Illinois Supreme Court Rule 401. *LeFlore*, 2013 IL App (2d) 100659, ¶ 29. Further, the dissenting justice in *LeFlore* suggested that the question of substantial compliance was a close one. *Id.* ¶ 68 (Birkett, J., concurring in part and dissenting in part). And although the appellate court considered the Rule 401 issue under the plain error doctrine, it pointed out that defendant's attorney did raise the issue of improper admonishments to the trial court, but he failed to include it in the motion to reconsider sentence. *Id.* ¶ 51 (majority opinion).

¶ 85    The dissent's suggestion that the supreme court's decision in *LeFlore*, 2015 IL 116799, supports its analysis is not supported by any pertinent authority. The Rule 401 issue was not before the supreme court in *LeFlore* because the State conceded improper admonishments on appeal to the supreme court.

¶ 86    Finally, even if the trial court did not properly admonish defendant in this one regard, the lack of a single admonition does not mean that the trial court did not substantially comply with Rule 401. Nor does it mean that the waiver of counsel was not knowing and voluntary. Most important, it does not mean that the failure to comply with Rule 401 amounts to plain error. Defendant must still show that the lack of the admonishment so infected the entire trial proceedings or challenged the integrity of the judicial process so as to deny the defendant his fundamental right to a fair trial. *Herron*, 215 Ill. 2d at 187.

¶ 87    Here, the record overwhelmingly supports our conclusion that during the initial proceedings in April 2011, the circuit court judges properly admonished the defendant in open court about the nature of the charges. Defendant was also aware that he had a right to an attorney (one was appointed to represent him), that he had the right to represent himself, and he was advised of the possible penalties before accepting the waiver of counsel. The trial court also accurately stated the minimum and maximum sentence for residential burglary, which is 4 to 15 years. Residential burglary, a Class 1 felony, is generally a nonprobationable offense, and carries a mandatory prison term of 4 to 15 years as stated by the circuit judge. See 720 ILCS 5/19-3(b) (West 2010); 730 ILCS 5/5-4.5-30(a), 5-5-3(c)(2)(G) (West 2010). These admonishments were significant. This is not a case where no admonishments were given. As the State points out and as we earlier pointed out, the trial court questioned defendant extensively about his waiver of the right to counsel. In addition to those matters discussed above, the trial judge inquired as to his education, any experience he had previously in representing himself, and whether he had been charged with a felony before. Defendant responded yes to both of those inquiries. Defendant then also explained those matters.

¶ 88    The judge advised defendant that although he had the right to represent himself, defendant would be held to the same standards as an attorney, and that defendant would not have a public defender to stand by and help him with his case.  The trial judge advised him of the dangers and disadvantages of self representation, which is what the trial court is supposed to do, to ensure that a defendant's waiver is voluntarily and knowingly made.

¶ 89    Under the facts of this case, when the trial judge advised the defendant of the possible penalties, he correctly advised defendant of the minimum and maximum penalties for residential burglary.  It is correct that the trial judge in this case did not advise the defendant of the penalty which the defendant may have been subject to because of his prior convictions, we conclude that although not strict compliance with the rule, there was substantial compliance and the waiver of counsel was knowing and voluntary.

¶ 90    In this case, the dissent has essentially substituted the required substantial compliance with strict compliance and is imposing a burden upon trial judges that is not supported by established precedent.  Our supreme court directed in *Kidd* that: "[t]he determination of whether there has been an intelligent waiver of the right to counsel, *** depend[s], in each case, upon the particular facts and circumstances of that case, including the background, experience, and conduct of the accused." *Kidd*, 178 Ill. 2d at 105.

¶ 91    Our supreme court first recognized in the *Johnson* decision, that strict compliance with Rule 401 is not required. *Johnson*, 119 Ill. 2d at 132.  There, the supreme court first stated: substantial compliance will be sufficient to effectuate a valid waiver of counsel if the record indicates the waiver was made knowingly and intelligently and the admonishment the defendant received did not prejudice his rights.  *Id*.  To say we have misread and misapplied this language

ignores the record in this case and focuses only upon a lacking admonition as opposed to considering what admonitions were made.

¶ 92     As already pointed out above, we are not suggesting judges should not comply with supreme court rules, but the purpose of Rule 401 is not to make sure that the judge followed the dissent's view of the rule, its true  purpose is to ensure that the defendant knowingly and intelligently waived his right to counsel.  As a reviewing court, we must analyze each case on its own facts, on its own merits, and determine whether the purpose of the rule has been met.  There was no denial of the right to counsel in this case.  The moment the defendant requested an attorney, one was provided. If he had made that request sooner, the trial judge would no doubt have honored that request.

¶ 93     We cannot emphasize enough the actual purpose of Supreme Court Rule 401.  It is to ensure that a defendant's waiver of counsel is knowingly and voluntarily made.

¶ 94     The rule has several parts or admonishments that need to be given, to ensure a defendant understands that giving up the right to an attorney is a significant decision.  The most important admonishment is that of the right to an attorney, and if indigent, an attorney will be appointed to represent the accused.  Giving up that right can result in unforeseen consequences to the serious detriment of the accused.  Another part of the Rule is to make certain that a defendant knows that self representation may result in imprisonment, in other words, the great loss of one's liberty. Finally, another important purpose of the Rule is to advise a defendant of the charges he will be facing should he give up the right, without the benefit of an experienced advocate to defend him. These are the dangers and disadvantages a defendant must be aware of, so that his choice is made with his eyes wide open.  See *Kidd*, 178 Ill. 2d at 104.  If a defendant is aware of all of these, a

45

trial court can then determine whether to permit the waiver or not, and then we as a reviewing court can later determine whether the waiver was knowingly and understandingly made.

¶ 95 A defendant does not need to possess the skills and experience of a lawyer to competently and intelligently choose self representation. There is no reason to equate or compare the ability to make a knowing choice with equivalent of a juris doctor degree. Otherwise the constitutional right would only be available to attorneys or to those who, even the United States Supreme Court has noted, " 'have a fool for a client.' " *Kay v. Ehrler*, 499 U.S. 432, 438 (1991).

¶ 96 Although defendant has a substantial criminal record, this appeal is not about the fact that defendant has been repeatedly arrested and convicted of criminal offenses or about his long rap sheet. It is about his ability to make a knowing and intelligent waiver of the right to counsel. The record abundantly establishes that he did so.

¶ 97 When the defendant was advised of his right to counsel by Judge Grossi, he was aware of all the charges, he was aware of his right to an attorney and an appointed attorney as well, and he was aware of the minimum and maximum sentence for residential burglary. The record before us, just at that one proceeding, establishes substantial compliance with the rule.

¶ 98 Defendant next contends that the trial court committed multiple errors during the suppression hearing which entitle him to a new suppression hearing. Specifically, defendant argues that the trial court: (1) violated his privilege against self-incrimination when it allowed the State to broaden the scope of the suppression hearing; and (2) erroneously barred defendant from calling a witness to contradict Chief Lukaszek's account of the traffic stop.

¶ 99 The State initially responds that defendant has forfeited these issues by failing to adequately preserve them in the trial court. Defendant maintains that under *People v. Cregan*,

2014 IL 113600, ¶¶ 15-20, he sufficiently preserved his claim of a constitutional violation of his right against self-incrimination by objecting in the trial court. *Cregan* held that an objection to a constitutional violation at trial is sufficient to preserve the issue for appeal without raising the issue in a posttrial motion. *Id.* The State contends that *Cregan* does not apply because defendant did not object to a constitutional violation in the trial court, but has only raised that basis on appeal.

¶ 100   During his testimony at the suppression hearing, defendant objected to the State's question concerning his whereabouts prior to driving on Wolf Road as irrelevant. On appeal, defendant challenges this question under a new theory, that it violated his privilege against self-incrimination. According to defendant, this change does not affect his preservation of the issue. Regardless of whether defendant preserved the issue, the State concedes that we can review it under plain error, so we will review the issue for any error.

¶ 101   Defendant also asks this court to review the remaining claims regarding his suppression hearing under the second prong of plain error. As stated above, The plain error rule "allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565. But first, we must determine whether there was any error before reaching plain error analysis. See *Lewis*, 234 Ill. 2d at 43.

¶ 102   We turn to defendant's argument that the trial court violated his right against self-incrimination by allowing the State to broaden the scope of the suppression hearing.

Specifically, defendant argues that the court violated Illinois Rule of Evidence 104(d) (eff. Jan. 1, 2011) by allowing the prosecutor to question defendant on cross-examination about his activities before being observed by the police on Wolf Road.

¶ 103   The prosecutor asked defendant where he and Love were coming from when driving on Wolf Road, and defendant objected that the question was irrelevant, which the trial court overruled.  When defendant said they were looking for a gas station, the prosecutor again asked where defendant was coming from.  Defendant questioned the relevancy and said they were looking for a friend's house.  The prosecutor reiterated that the question was where was he coming from, not where was he going.  Defendant denied that he was coming from the location of the residential burglary, but stated that he could not recall where he was coming from at that time.

¶ 104   "Every criminal defendant is privileged to testify in his own defense, or to refuse to do so." *Harris v. New York*, 401 U.S. 222, 225 (1971).  "It is essential, therefore, to the proper functioning of the adversary system that when a defendant takes the stand, the government be permitted proper and effective cross-examination in an attempt to elicit the truth. The defendant's obligation to testify truthfully is fully binding on him when he is cross-examined.  His privilege against self-incrimination does not shield him from proper questioning." *United States v. Havens*, 446 U.S. 620, 626-27 (1980); see also *People v. Stevens*, 2014 IL 116300, ¶ 16 ("The defendant who takes the stand and testifies in his own behalf in a criminal case not only offers himself as a witness in his own behalf but thereby subjects himself to legitimate cross-examination.").  "[L]egitimate cross-examination includes 'all circumstances within the knowledge of the witness which explain, qualify, discredit or destroy his direct testimony.' " *Id.* ¶ 17 (quoting *People v. Williams*, 66 Ill. 2d 478, 486 (1977)).

¶ 105   These principles notwithstanding, Illinois Rule of Evidence 104(d) provides: "The accused does not, by testifying upon a preliminary matter, become subject to cross-examination as to other issues in the case." Ill. R. Evid. 104(d) (eff. Jan. 1, 2011). "The extent of cross-examination with respect to an appropriate subject of inquiry rests in the sound discretion of the trial court." *Stevens*, 2014 IL 116300, ¶ 16. Thus, defendant's decision to testify at the suppression hearing allowed the State the opportunity to cross-examine him, but only regarding matters germane to the suppression hearing. According to defendant, his whereabouts prior to driving on Wolf Road were beyond the scope of the suppression hearing. We disagree.

¶ 106   The trial court properly allowed the prosecutor to ask defendant about the circumstances of the day, which were contemporaneous with the time of the traffic stop. A question regarding where defendant was coming from prior to being on Wolf Road was relevant. Defendant testified that he was driving legally on northbound Wolf Road when he was stopped by a black Tahoe with flashing lights. In contrast, Chief Lukaszek stated that he observed defendant's van driving southbound on Wolf Road, when the van made an illegal U-turn to go northbound on Wolf Road.   Depending on defendant's answer, his prior location could have further supported his testimony that he had not broken any traffic laws and did not commit the burglary. Cross-examination regarding defendant's location prior to the traffic stop was relevant to the suppression hearing and factored into whether the officers had a reasonable suspicion to stop defendant's vehicle.

¶ 107   Moreover, by testifying, defendant had placed his credibility at issue and the State was entitled to ask him questions about the events of the day. *People v. Barner*, 374 Ill. App. 3d 963, 971 (2007) ("By choosing to testify, a defendant puts his credibility on the line."). The question was asked several times because defendant evaded answering it. He responded with vague

contradictory answers about where he was going, such as, looking for a gas station, and looking for a friend's house. Defendant denied coming from 333 Jackson Boulevard in Hillside, but he eventually answered that he could not recall. The question was relevant to assess defendant's credibility. As defendant concedes that the evidence at the suppression hearing was a credibility contest, his own credibility was plainly relevant. It was further reasonable for the trial court to rely on defendant's responses to assess his credibility. Therefore, the trial court did not err in allowing the State to inquire where defendant had been prior to driving on Wolf Road.

¶ 108   Defendant also argues that the trial court erred in allowing the State to ask if defendant had any proceeds from the burglary in his van. Defendant contends that the prosecutor's question did not bear on any relevant legal fact and violated his rights. In support, defendant cites *People v. Smith*, 67 Ill. App. 3d 952 (1978), but we find the conclusion in *Smith* does not support a finding of plain error.

¶ 109   In *Smith*, during a suppression hearing, the prosecutor asked the defendant about the contents of a box recovered from the defendant's vehicle during a traffic stop. Over objection, the defendant admitted the box held substances allegedly containing marijuana and substances allegedly containing amphetamines. When the defendant was asked if he knew what the substance was, the defendant refused to answer and invoked his fifth amendment rights. The trial court subsequently denied the defendant's motion to suppress " 'because of failure to answer questions on cross-examination.' " *Id*. at 957.

¶ 110   On appeal, the defendant argued that the trial court erred in denying the motion without considering the merits. The reviewing court noted that the sole issue raised in the motion to suppress was whether the warrantless search and seizure was unreasonable. "Defendant's testimony thereon at the hearing was limited to the events surrounding the search and seizure.

The prosecution inquiry on cross-examination of whether defendant knew what the substances were – as to the question of to whom they belonged – was neither within the scope of direct examination nor even germane to the issues raised by the motion to suppress." *Id.* at 958. The *Smith* court concluded that the trial court erred in overruling the defendant's objections, but the reviewing court ultimately held that the error was harmless. *Id.* at 959-60. "A defendant may not avail himself of any error on his motion to suppress if the evidence both at the hearing on the motion and at trial establishes the legality of the search and seizure thus rendering the product of such to have been properly admissible." *Id.* at 959.

¶ 111    Here, the police had a reasonable suspicion to stop defendant. Chief Lukaszek testified that he received a report of a residential burglary at 333 Jackson Boulevard, less than a mile from where he was driving. The report stated that a red Chevy van with two male black offenders fled the scene and were driving on Madison Street toward Wolf Road. Within 10 seconds of the report, Chief Lukaszek observed defendant's red van driving southbound on Wolf Road. He then saw the vehicle make an illegal U-turn to drive northbound. He curbed the vehicle, but as he approached, the vehicle fled, driving approximately 85 mph and running three stop signs. The van turned into a mall parking lot, jumped a curb, and slid down an embankment. Once the vehicle stopped, the occupants fled on foot. Defendant was detained at the scene. Proceeds from the burglary were found in the van. Based on this evidence, even if the prosecutor's question exceeded the scope and the trial court erred in overruling defendant's objection, any error was harmless because the evidence supported a finding of probable cause.

¶ 112    Defendant also asserts that the trial court improperly relied on her own knowledge of the area along Wolf Road outside of the record. We disagree. During cross-examination, the prosecutor questioned defendant about his testimony that he was on Wolf Road looking for a gas

station.  The prosecutor then asked defendant if he saw several gas stations along Wolf Road, including intersections with Roosevelt Road, 22nd Avenue, and Cermak Road.  Defendant responded that he did not recall or remember seeing the gas stations.  Again, these questions went to defendant's credibility.  His testimony was that he was going to a gas station, but did not recall seeing any of the gas stations along his path.  He said he was unfamiliar with the area, but fled in fear for his life to a populated area.  The trial court properly concluded that defendant's testimony was not credible based on his conflicting testimony that he was unfamiliar with the area, but knew where a mall was in the area.  While the court did not refer to any gas stations beyond those mentioned in the prosecutor's questions to defendant, the difference was the court stated what brand of gas station was at one intersection.  This knowledge of the area, such that the judge knew the gas station at Wolf Road and Roosevelt Road was a Citgo and was now a Shell station, did not impact the court's ruling.  The trial court was not basing its ruling on information outside of the record, but instead the court considered defendant's vague and conflicting testimony which was not error.

¶ 113   Next, defendant contends that the trial court erred in barring him from calling Detective Milazzo to testify at the suppression hearing.  Detective Milazzo was unable to appear at the hearing due to a death in his family.  At the conclusion of the hearing, defendant sought to call the detective and the trial court asked if the detective's testimony would be cumulative to Chief Lukaszek's testimony.  Defendant responded that he did not know, but intended to ask him the same questions he asked Chief Lukaszek.  The trial court found this testimony would be cumulative.  Evidence is considered cumulative when it adds nothing to what was already before the fact finder.  *People v. Ortiz*, 235 Ill. 2d 319, 335 (2009).

¶ 114   Defendant bases his contention that the testimony would not have been cumulative on differences in Detective Milazzo's trial testimony from Chief Lukaszek's testimony at the suppression hearing.  Specifically, defendant focuses on Detective Milazzo's testimony that the red van was observed turning off southbound Wolf Road onto eastbound Harrison Street compared to Chief Lukaszek's testimony that he observed the red van make an illegal U-turn from southbound Wolf Road to northbound, then turn onto Harrison Street.  We find this difference would make no difference when the officers had a reasonable suspicion to stop defendant's van.  There is no dispute in their testimony that the red van was seen near Wolf Road and Harrison Street immediately after the report of the burglary, which was less than a mile away.  Even if the trial court erred in finding that Detective Milazzo's testimony would be cumulative, defendant's motion to suppress would not have been granted and does not amount to plain error.

¶ 115   Regardless of whether the driver committed a traffic infraction, the officers had a reasonable basis to detain defendant following the report of the burglary.  Pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), a police officer may, under appropriate circumstances, briefly detain a person for investigatory purposes if the officer reasonably believes that the person has committed, or is about to commit, a crime.  *Maxey*, 2011 IL App (1st) 100011, ¶ 45 (citing *Terry*, 392 U.S. at 21-22).  "To justify a *Terry* stop, a police officer may detain a person without having probable cause to arrest; however, the officer must have a reasonable, articulable suspicion that the person detained has committed or is about to commit a crime."  *Id.* ¶ 46 (citing *Terry*, 392 U.S. at 21-22).  "Under a 'reasonable suspicion' standard, the evidence necessary to justify a *Terry* stop need not rise to the level of probable cause and can even arise when no violation of the law is witnessed; however, a mere hunch is insufficient."  *Id.*

¶ 116   The circumstances of defendant's stop in this case are strikingly similar to defendant's prior arrest for attempted aggravated robbery.  In that case, as previously discussed, defendant represented himself *pro se* at a suppression hearing.  The testimony disclosed that Aselo Hernandez and his son Hector were working at Hector's Upholstery Store on South Western Avenue in Chicago when defendant entered with a handgun and said it was a robbery.  During a struggle, the gun was knocked from defendant's grip and found to be a fake.  Defendant fled and Hector ran after defendant.  An officer testified that in an interview following the robbery, Hector said defendant fled in a red or maroon Oldsmobile with temporary license plates.  During the course of the officer's testimony, the trial court advised defendant that he needed the assistance of an attorney to properly present his motion.  Defendant agreed and requested counsel.  The hearing was continued for several months.  *Id.* ¶¶ 4-11.

¶ 117   At the continued hearing, a police officer testified that he was driving an unmarked police car when he heard the radio call of the robbery and drove near an intersection reported in a transmission and within two to three minutes observed a red or burgundy vehicle with temporary plates driving east on 103rd Street.  The officer then curbed vehicle.  He stated that the distance from the traffic stop to the upholstery store was approximately one mile.  *Id*. ¶¶ 14-17.  The trial court granted defendant's motion to suppress, but the reviewing court reversed, finding that the police had a reasonable suspicion to justify the *Terry* stop, which ripened into probable cause. *Id*. ¶ 68.  "Considering the totality of the circumstances, the facts known to the officer at the time of the arrest were sufficient to lead a reasonably cautious person to believe that defendant was the suspect in the attempted robbery at the upholstery store, and thus the arrest was lawful." *Id*. ¶ 75.

¶ 118   Likewise, in the instant case, the testimony of both officers, whether at the suppression hearing or at trial, showed that defendant's red van matched the description of the perpetrators' vehicle and was seen less than a mile from the location of the burglary within seconds of the radio call.  Any discrepancy in the testimony does not negate these facts and even if defendant did not commit a traffic violation, the officers had reasonable suspicion to detain defendant for a *Terry* stop.  Defendant's flight from the stop further ripened into probable cause to arrest.  No plain error occurred in denying defendant's request to present Detective Milazzo's testimony at the suppression hearing.

¶ 119   Next, defendant asserts that the trial court did not obtain a knowing and voluntary jury waiver before proceeding with a bench trial.  The State maintains that defendant executed a knowing and voluntary waiver of his right to a jury trial.  The State again initially contends that this issue has been forfeited because defendant failed to raise this claim before the trial court.  Defendant admits that he failed to preserve this issue, but asks this court to review it under the plain error rule.  Defendant argues that the validity of a jury waiver is reviewable under the second prong of plain error because it affected his substantial rights.  See Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967).  As previously stated, "[t]he first step of plain-error review is to determine whether any error occurred."  *Lewis*, 234 Ill. 2d at 43.

¶ 120   "The right to a trial by jury is a fundamental right guaranteed by our federal and state constitutions."  *People v. Bracey*, 213 Ill. 2d 265, 269 (2004); see also U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8.  Nevertheless, a defendant can waive his right to a jury trial, but for a waiver to be valid, it must be knowingly and voluntarily made.  *Bracey*, 213 Ill. 2d at 269.  See also 725 ILCS 5/103-6 (West 2010).  Under section 115-1 of the Code of Criminal Procedure of 1963, a jury waiver must be in writing.  725 ILCS 5/115-1 (West 2010).

¶ 121  The trial court has a duty to ensure that the defendant waived his right to a jury trial "expressly and understandingly." *People v. Bannister*, 232 Ill. 2d 52, 66 (2008). "However, a trial court need not give any specific admonition or advice for a defendant to make an effective jury waiver." *Id.* "Whether a jury waiver is valid cannot be determined by application of a precise formula, but rather turns on the particular facts and circumstances of each case." *Bracey*, 213 Ill. 2d at 270. The statutory requirement for a written jury waiver does not "define or give substance to the constitutional right to choose whether to have a jury trial. Rather, a written jury waiver merely memorializes the defendant's decision, allowing a court to review the record to ascertain whether a defendant's jury waiver was made understandingly." *Bannister*, 232 Ill. 2d at 66. "Generally, a jury waiver is valid if it is made by defense counsel in defendant's presence in open court, without an objection by defendant." *Bracey*, 213 Ill. 2d at 269.

¶ 122  Immediately prior to the start of the bench trial, the trial court discussed defendant's written jury waiver. Defendant had executed a written waiver, which stated "I, the undersigned, do hereby waive jury trial and submit the above entitled cause to the Court for hearing." The court then confirmed that it was defendant's signature on the written waiver. The court admonished defendant that he was giving up his right to have a trial by jury and asked him if he knew what a jury trial was. Defendant responded in the affirmative to both inquiries.

¶ 123  Defendant argues that this exchange did not show an understanding and voluntary waiver of a jury trial because the court failed to explain anything about the rights to a jury trial as well as explain the concept of a bench trial.

¶ 124  Based on the record before this court, we find no error in the execution of defendant's jury waiver. In addition to defendant's written waiver and statement that he understood what a jury trial was and his waiver of that right as noted above, defense counsel had previously

indicated that the case would likely be a bench trial. In October 2012, the trial court at a status hearing was attempting to set the trial date and asked if the case would be a jury trial or bench trial. Defense counsel answered, "We certainly think at this point it's a bench trial." Defendant did not object to his counsel's statement. Further, the trial court discussed defendant's other pending case and asked defendant if that case was bench trial or jury trial, and defendant answered, "Jury." At the conclusion of the proceedings, the court noted the date for trial and "bench indicated," without objection. Moreover, as previously recognized, defendant has extensive experience with the criminal justice system. Even if we did not consider defendant's criminal history, the trial court did not err in obtaining defendant's written jury waiver, when defendant orally affirmed he understood his right to a jury trial on the record. We conclude that defendant knowingly and voluntarily waived his right to a jury trial.

¶ 125   We are unpersuaded by cases cited by defendant. In *People v. Phuong*, 287 Ill. App. 3d 988 (1997), a recent Chinese immigrant was charged with retail theft and received a court-appointed attorney. Prior to trial, the defendant signed a written jury trial waiver that had been translated from English into Chinese. *Id.* at 991. The trial court informed the defendant that she could be tried by either a judge or a jury without further elaboration. Defense counsel stated that the defendant had agreed to a bench trial. *Id.* On appeal, the appellate court reversed the defendant's conviction, finding that her jury trial waiver had not been made knowingly. *Id.* at 996. The reviewing court pointed out that the defendant did not speak English and had no prior involvement in the American criminal justice system. *Id.* Although the court acknowledged that the defendant had signed a written jury trial waiver form, it indicated that it was "not convinced that the mere translation of the waiver form adequately conveyed its meaning to defendant." *Id.* The court observed that "[i]f defendant did not understand the nature of a jury or its function

57

within the system, then she would not understand the ramifications of her waiver of that right."

*Id.* Similarly, in *People v. Murff*, 69 Ill. App. 3d 560, 564 (1979), the reviewing court found the

jury waiver inadequate to show that the defendant, who was undergoing psychiatric treatment for

schizophrenia, understood and that "a greater concern or consideration may have been necessary"

under the circumstances. Nothing similar to these unique circumstances was present in this case.

¶ 126   Defendant next contends that the State's evidence failed to prove the charge of aggravated

fleeing or attempting to elude a peace officer. When considering a challenge to the sufficiency

of the evidence, our inquiry is limited to "whether, after viewing the evidence in the light most

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S.

307, 319 (1979); accord *People v. Cox*, 195 Ill. 2d 378, 387 (2001).

¶ 127   Fleeing or attempting to elude a peace officer is defined in the Illinois Vehicle Code as

follows:

> "Any driver or operator of a motor vehicle who, having been given
>
> a visual or audible signal by a peace officer directing such driver or
>
> operator to bring his vehicle to a stop, wilfully fails or refuses to
>
> obey such direction, increases his speed, extinguishes his lights, or
>
> otherwise flees or attempts to elude the officer, is guilty of a Class
>
> A misdemeanor. The signal given by the peace officer may be by
>
> hand, voice, siren, red or blue light. Provided, the officer giving
>
> such signal shall be in police uniform, and, if driving a vehicle,
>
> such vehicle shall display illuminated oscillating, rotating or
>
> flashing red or blue lights which when used in conjunction with an

audible horn or siren would indicate the vehicle to be an official

police vehicle." 625 ILCS 5/11-204(a) (West 2010).

¶ 128 Aggravated fleeing or attempting to elude a peace officer is committed by any driver who flees or attempts to elude a peace officer, after being given a visual or audible signal by a peace officer in the manner prescribed in subsection (a) of section 11-204 of this Code, and such flight or attempt to elude: (1) is at a rate of speed at least 21 miles per hour over the posted speed limit; (2) causes bodily injury to an individual; (3) causes damage to property in excess of $300; (4) involves disobedience of two or more official traffic control devices; or (5) involves the concealing or altering of the vehicle's registration plate. 625 ILCS 5/11-204.1(a) (West 2010).

¶ 129 Defendant argues that the State failed to prove that the officers attempting to make the stop were in uniform and that an officer in a vehicle must have certain lights on the vehicle. In support of his argument, defendant relies on the Second District decision of *People v. Murdock*, 321 Ill. App. 3d 175 (2001).

¶ 130 In *Murdock*, the defendant was found guilty of aggravated fleeing or attempting to elude a peace officer, and on appeal, contended that there was no evidence presented that the officer pursuing him was in a police uniform. *Id.* at 176. The Second District "carefully reviewed the evidentiary record and can find no evidence presented concerning the clothing the officer wore on the day in question. Moreover, the State failed to ask the arresting officer whether he was wearing a police uniform at the time of the pursuit." *Id*. The reviewing court rejected the State's argument that "because the officer activated his overhead emergency lights and siren, defendant should have known that the pursuer was a police officer and the purpose of the statute would be fulfilled by upholding the conviction." *Id.* at 177. The *Murdock* court concluded that "proof of

an essential element of the offense is lacking in this case" and accordingly, the court reversed defendant's conviction and vacated the corresponding sentence. *Id.*

¶ 131    The State admits that *Murdock* supports defendant's argument, but maintains that the decision was wrongly decided.  "Although the statute may be read to mandate that the officer must be in uniform before the defendant can be charged with fleeing and eluding a police officer, here the goal of the statute is plainly met by defendant's pulling over in the first place."  The State further contends that "[t]he legislature clearly did not mean to provide protection to solely uniformed officers, and if defendant subjectively believed he was fleeing from the police, the purpose of the law is met."

¶ 132    Recently, the Second Division of the First District addressed the same issue in *People v. Williams*, 2015 IL App (1st) 133582, and adhered to *Murdock*'s finding that an essential element of the offense of aggravated fleeing or attempting to elude a peace officer is that the officer be in uniform.  The *Williams* court also considered the State's objections to the holding in *Murdock*. "Citing the legislative history, the State asserts that the statute's intent was to punish people who knowingly flee from the police, and, therefore, the uniform requirement can only be read as a way to exclude those trying to escape a dangerous situation, not as a bar on prosecution of people willfully fleeing the police."  *Id.* ¶ 12.  The reviewing court then discussed the principles of statutory construction.  The court observed when considering a question of statutory construction, "the court's objective involves ascertaining and carrying out the 'true intent and meaning of the legislature evidenced by the language used.' "  *Id.* ¶ 13 (quoting *Langendorf v. City of Urbana*, 197 Ill. 2d 100, 109 (2001)).

> "Indeed, our inquiry 'always begin[s] with the language of the
> statute, which is the surest and most reliable indicator of legislative

intent.' *People v. Pullen*, 192 Ill. 2d 36, 42 (2000). We give undefined statutory words and phrases their natural and ordinary meaning. *Id.* And we enforce the clear and unambiguous language as written without resort to other aids of construction, *e.g.*, referring to legislative history. *People v. Fitzpatrick*, 158 Ill. 2d 360, 364-65 (1994). In addition, it is not the role of the court to act as editor 'correcting' apparent legislative oversights under the guise of statutory interpretation." *Id.*

¶ 133 In light of these principles, the *Williams* court concluded that "the plain language of section 11-204(a) of the Illinois Vehicle Code requires a pursuing officer be in police uniform for a defendant to be found guilty of fleeing or attempting to elude a peace officer." *Id.* ¶ 14. "Because of the clear and unambiguous statutory language, we do not inquire into the legislative history relied on by the State in its brief." *Id.*

¶ 134 Here, the evidence failed to establish the essential element that the officers were in uniform. Detective Milazzo's testimony at trial failed to mention what the officers were wearing at the time of the stop. Detective Milazzo testified he was a passenger in a vehicle driven by Chief Joseph Lukaszek. He received a call for a burglary at 333 Jackson Boulevard which mentioned a red van leaving the scene, and the officers were driving near Wolf Road and Harrison Street, about half a mile from the burglary. Detective Milazzo stated that they saw a red van turning from southbound Wolf Road onto eastbound Harrison Street. The chief activated the police lights and effected a traffic stop of the van on Harrison Street. No evidence was presented at trial that the officers were in uniform, as required by section 11-204.

¶ 135   Additionally, both *Williams* and *Murdock* rejected the State's assertion that if defendant believed he was fleeing from the police, then the goal of the statute was met.  As the *Williams* court found, "[t]he operative concern, as in *Murdock*, is not whether [the defendant] knew the police were following him; but rather, whether the requirements of the statute have been met." *Id.* ¶ 16.  Because the clear and unambiguous language of the statute requires proof that the police officers were in uniform, defendant's conviction cannot stand.  Accordingly, we reverse defendant's conviction for aggravated fleeing or attempting to elude a peace officer and vacate his three-year sentence on this conviction.

¶ 136   Since we have found that the State failed to prove an essential element of the offense which mandated reversal of the conviction, we need not address whether the State also failed to present evidence that the officers' vehicle had the lights required by the aggravated fleeing statute.

¶ 137   Finally, defendant argues that the fines and fees order should be reduced by $24 to reflect improperly imposed fines and full credit for time spent in custody prior to trial.  Specifically, defendant contends that the electronic citation, Public Defender Records Automation, and State's Attorney Records Automation fees should be vacated, and a credit should be applied to the State Police Operations fee.

¶ 138   "[A] 'fine' is a part of the punishment for a conviction, whereas a 'fee' or 'cost' seeks to recoup expenses incurred by the state—to 'compensat[e]' the state for some expenditure incurred in prosecuting the defendant." *People v. Jones*, 223 Ill. 2d 569, 582 (2006).

> " 'A "fine" is a pecuniary punishment imposed as part of a sentence
> on a person convicted of a criminal offense.  *People v. Despenza*,
> 318 Ill. App. 3d 1155, 1157 (2001).  A "cost" is a charge or fee

taxed by a court such as a filing fee, jury fee, courthouse fee, or reporter fee. *Despenza*, 318 Ill. App. 3d at 1157. Unlike a fine, which is punitive in nature, a cost does not punish a defendant in addition to the sentence he received, but instead is a collateral consequence of the defendant's conviction that is compensatory in nature. *People v. Terneus*, 239 Ill. App. 3d 669, 672 (1992). A "fee" is a charge for labor or services, especially professional services. Black's Law Dictionary 629 (7th ed. 1999).' " (Emphasis omitted.) *Id.* at 581 (quoting *People v. White*, 333 Ill. App. 3d 777, 781 (2002)).

¶ 139　The State agrees that the electronic citation fee should be vacated if this court reverses defendant's conviction for aggravated fleeing or attempting to elude a peace officer, which we have done. Section 27.3e of the Clerks of Courts Act provides: "To defray the expense of establishing and maintaining electronic citations, each Circuit Court Clerk shall charge and collect an electronic citation fee of $5. Such fee shall be paid by the defendant in any traffic, misdemeanor, municipal ordinance, or conservation case upon a judgment of guilty or grant of supervision." 705 ILCS 105/27.3e (West 2010). Defendant's remaining residential burglary conviction is a felony and does not fall under section 27.3e and, therefore, the $5 electronic citation fee is vacated.

¶ 140　Next, the State agrees that defendant is entitled to presentence credit for $15 State Police Operations charge pursuant to section 27.3a(1.5) (705 ILCS 105/27.3a(1.5) (West 2010)). "Under section 27.3a(1.5) of the Clerks of Courts Act, a circuit clerk in any county that imposes a fee for maintaining automated record keeping systems pursuant to section 27.3a(1) of the

Clerks of Courts Act must collect an additional fee, the State Police operations assistance fee, to be paid by the defendant in any felony, traffic, misdemeanor, or local ordinance violation upon a judgment of guilty or grant of supervision." *People v. Millsap*, 2012 IL App (4th) 110668, ¶ 31; see also 705 ILCS 105/27.3a(1.5) (West 2010).

> "Section 27.3a(5) requires that the circuit clerk remit the fees collected under section 27.3a(1.5) to the State Treasurer to be deposited into the State Police Operations Assistance Fund. 705 ILCS 105/27.3a(5) (West 2010). Moneys in the State Police Operations Assistance Fund may be used by the Illinois Department of State Police to 'finance any of its lawful purposes or functions.' 30 ILCS 105/6z-82(b) (West 2010) (text of section as added by Public Act 96-1029 (eff. July 13, 2011)). Additionally, the legislature subsequently amended section 27.3a, effective August 19, 2011, to allow the Director of the State Police to use State Police operations assistance fees for homeland security purposes. See 705 ILCS 105/27.3a(6) (West Supp. 2011). Accordingly, we find that the State Police Operations Assistance fee does not reimburse the State for costs incurred in defendant's prosecution." *Millsap*, 2012 IL App (4th) 110668, ¶ 31.

¶ 141    Since the state operations charge under section 27.3a(1.5) is a fine, defendant is entitled to presentence credit toward it. See 725 ILCS 5/110-14(a) (West 2010) ("Any person incarcerated on a bailable offense who does not supply bail and against whom a fine is levied on

conviction of such offense shall be allowed a credit of $5 for each day so incarcerated upon application of the defendant.").

¶ 142   Defendant also argues that the assessments of $2 each for the Public Defender Records Automation fee (55 ILCS 5/3-4012 (West 2010)) and the State's Attorney Records Automation fee (55 ILCS 5/4-2002(a) (West 2010)) were error because the charges amounted to fines imposed in violation of *ex post facto* principles since the enactment of the fines was June 1, 2012, after the date of the offense in this case, April 18, 2011.

¶ 143   In *People v. Rogers*, 2014 IL App (4th) 121088, ¶ 30, the Fourth District held that the State's Attorney Records Automation is a fee which is intended to reimburse the State's Attorneys for expenses related to automated record-keeping systems, and is not subject to the prohibition against *ex post facto* laws. *Id.* (" 'The prohibition against *ex post facto* laws applies only to laws that are punitive.  It does not apply to fees, which are compensatory instead of punitive.' " (quoting *People v. Dalton*, 406 Ill. App. 3d 158, 163 (2010))).

¶ 144   This court has previously adhered to the conclusion reached in *Rogers* that the State's Attorney Records Automation fee is not subject to *ex post facto* concerns, and we see no reason to depart from that holding.  See *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 64.  Likewise, "because the statutory language of both the Public Defender and State's Attorney Records Automation fees is identical except for the name of the organization, we find no reason to distinguish between the two statutes, and conclude both charges constitute fees which were properly assessed." *Id*. ¶ 65 (citing 55 ILCS 5/3-4012, 4-2002.1(c) (West 2012)).

¶ 145   Based on the foregoing reasons, we affirm defendant's conviction and sentence for residential burglary, and reverse his conviction for aggravated fleeing or attempting to elude a peace officer and vacate the sentence of three years imposed on that conviction.  Pursuant to this

court's authority to correct a mittimus without remand (*People v. Rivera*, 378 Ill. App. 3d 896, 900 (2008)), we direct the clerk of the circuit court to correct the fines and fees order to reflect that defendant's presentence credit applies to his $15 State Police Operations fine, and vacate the $5 electronic citation fee.

¶ 146   Affirmed in part, reversed in part; fines and fees order corrected.

¶ 147   JUSTICE ELLIS, concurring in part and dissenting in part.

¶ 148   I concur in the reversal of defendant's conviction for aggravated fleeing. I also agree that defendant's waiver of a jury trial was knowing and voluntary. I respectfully dissent from the majority's holding that the trial court substantially complied with Rule 401(a).

¶ 149   In this case, the trial court admonished defendant that he was facing a sentence of 4 to 15 years if convicted of residential burglary, when it was really 6 to 30 years, and the trial court ultimately sentenced defendant to 20 years for that crime. The majority says that this admonishment was "partially correct." It was not. It was completely wrong. It understated the maximum sentence by half. I do not see how that admonishment could be viewed as correct by any measure, or by any fraction.

¶ 150   Recently, another appellate court faced these identical facts—the defendant was facing 6 to 30 years due to his Class X status, but he was told his sentencing range was 4 to 15 years, and he ultimately received 20 years. That court "fail[ed] to see compliance of any sort" with Rule 401(a) in these admonishments. *People v. LeFlore*, 2013 IL App (2d) 100659 ¶ 53, *aff'd in part, rev'd in part on other grounds*, 2015 IL 116799 (supreme court reversed on separate fourth amendment issue, after State conceded error on Rule 401(a) violation). I think the *LeFlore* appellate decision was correctly decided on the Rule 401(a) issue, as apparently did the State,

which *conceded* the error before the supreme court and agreed that reversal was warranted due to the incompetent admonishments. *People v. LeFlore*, 2015 IL 116799, ¶¶ 13, 72.

¶ 151    Nothing in the majority's thorough and carefully-researched opinion changes these fundamental facts: Defendant was not informed of the correct potential sentence, and he did not otherwise understand what it was. The majority does not and could not claim otherwise. Based on those facts and those facts alone, there was no basis for finding substantial compliance with Rule 401(a) in this case.

¶ 152    Supreme Court Rule 401(a)(2) provides that a circuit judge "shall not permit a waiver of counsel" by a defendant without first "informing him of and determining that he understands" the maximum and minimum sentence. S. Ct. R. 401(a)(2) (eff. July 1, 1984). In determining compliance with this rule, we must ask two questions: did the trial court "inform" the defendant of the appropriate sentencing range, and did the defendant "understand" his sentencing range? *Id*. Usually the defendant says he understands the admonishments as they are being given, so these two questions might seem to merge into one—but they are two separate questions no less, if we are to interpret the rule as written.

¶ 153    If we can answer "yes" to both questions—if the trial court informs the defendant of the correct potential sentence, and the defendant understands that information—we have strict compliance with Rule 401(a). Everyone agrees that did not happen here.

¶ 154    If we must answer "no" to both questions—if the trial court fails to inform the defendant of the applicable sentencing range, and the defendant does not otherwise understand what that range is—we have no compliance whatsoever with Rule 401(a), and the inquiry stops. See, *e.g.*, *People v. Campbell*, 224 Ill. 2d 80, 82 (2006) (where trial court failed to admonish defendant

before permitting him to proceed *pro se*, "there was no compliance, substantial or otherwise," with Rule 401(a)).

¶ 155   When we talk about substantial compliance, it seems to me we are often talking about the middle-ground situation where we answer one of those questions "yes" and the other one "no." That is, substantial compliance with the rule is found where, even though the trial court did not "inform" a defendant of the applicable sentencing range, the record shows that the defendant somehow "understood" that sentencing range, anyway. As the appellate court in *LeFlore* correctly described it, substantial compliance can be found " 'either because [the defendant] was already aware of the information that was omitted or because his degree of legal sophistication made it evident that he was aware of the information that compliance with the rule would have conveyed.' " *LeFlore*, 2013 IL App (2d) 100659, ¶ 52 (quoting *People v. Gilkey*, 263 Ill. App. 3d 706, 711 (1994)) I agree with that statement of the law, because it is faithful to Rule 401(a). The key here is that the defendant knew—"understood"—his applicable sentencing range, even though the trial judge did not "inform" him of it.[2]

¶ 156   For example, in *People v. Johnson*, 119 Ill. 2d 119, 132-33 (1987), the supreme court found substantial compliance because, "[a]lthough the trial court did not advise defendant that life imprisonment was the minimum penalty to which he would be subjected in the event he was convicted of the charges, the record reveals that he was aware of this penalty," because

---

[2] There is another class of substantial compliance cases that fall into a different category not applicable here: The supreme court has found substantial compliance where a defendant was at least made aware of the maximum penalty for the most serious offense he faced, even if he was not informed of the proper minimum sentence or the maximum sentence on a lesser charge. See, *e.g.*, *People v. Kidd*, 178 Ill. 2d 92, 113-14 (1997); *People v. Haynes*, 174 Ill. 2d 204, 242-43 (1996). The rationale is that as long as a defendant was informed of the worst-case scenario, he was sufficiently apprised of the gravity of his decision in waiving counsel, and the other information about sentencing paled in comparison. *Kidd*, 178 Ill. 2d at 113-14; *Haynes*, 174 Ill. 2d at 242-43. That is obviously not this case, where the trial court *understated* the maximum sentence by half. Nevertheless, these cases are consistent with my contention that the focus is on the defendant's understanding of his potential sentencing range in determining substantial compliance.

defendant was present during a lengthy pretrial dispute over *voir dire* questions concerning life imprisonment, at which the State had repeatedly noted that life imprisonment was a " 'mandatory sentence.' " For another example, if a defendant is not admonished as to the nature of the offense of delivery of a controlled substance, but the trial court thoroughly covers the related charge of delivery within 1,000 feet of a school upon dismissing that charge, and the defendant's criminal history reveals that he was previously convicted of the "nearly identical" offense of possession of a controlled substance and "had five other narcotics convictions," a court may find that the defendant obviously understood the nature of the charge of delivery of a controlled substance, even though the trial court did not specifically inform him of it. See *People v. Herndon*, 2015 IL App (1st) 123375, ¶¶ 27-28.

¶ 157   Another way this knowledge could be determined—a point of contention in this case—is where a defendant's "degree of legal sophistication made it evident that he was aware of the information." *LeFlore*, 2013 IL App (2d) 100659, ¶ 52. As another appellate court said it, a defendant's knowledge of his potential sentence, despite the trial court's failure to inform him of it, could be demonstrated in "the unusual case" that a defendant "has such a high degree of legal expertise that one may confidently assume he or she already knows the maximum penalty." *People v. Bahrs*, 2013 IL App (4th) 110903, ¶ 15.

¶ 158   But that is the only context in which a defendant's "legal sophistication" can be used to establish substantial compliance—where his "sophistication" or background leads to the inescapable conclusion that he *understood* his sentencing range despite the trial court's failure to so advise him. Merely noting a defendant's criminal history, and his experience in Illinois courts, and his amateur legal prowess, and his general appreciation of the importance of a lawyer,

without tying that to the conclusion that he *understood what his potential sentence was*, adds nothing whatsoever to the analysis of substantial compliance under Rule 401(a).

¶ 159   The closest that the majority comes to even suggesting that defendant understood that his sentencing range was 6 to 30 years is its note that defendant has been sentenced as a Class X mandatory felon in the past and previously indicated, in another case in a different courtroom concerning a different charge, that he was aware of his Class X status.

¶ 160   But I still fail to see how that information shows that defendant knew that he was facing a sentencing range of 6 to 30 years if convicted of residential burglary. First of all, the trial court in this case told him differently, a fact that we simply cannot brush aside. The trial court specifically told defendant that his maximum sentence for residential burglary was 15 years, to which defendant replied, "Right." I am not prepared to believe that, when defendant said, "Right" to this incorrect admonishment, he really meant, "Wrong," but kept that knowledge to himself. Nor am I prepared to believe that defendant was so sure of himself, so confident in his legal sophistication and knowledge, that he would assume that his own understanding of the sentencing laws was superior to that of an experienced trial judge. See *LeFlore*, 2013 IL App (2d) 100659, ¶ 58 ("We are not prepared to ascribe to defendant a heightened level of legal sophistication based on * * * the supposedly osmotic experience of being repeatedly arrested and convicted. A long rap sheet is not the equivalent of a *Juris Doctorate,* and recidivism with punishment infers a perverse level of sophistication.").

¶ 161   We should not expect that a lay person, whose greatest claim to fame is that he keeps committing crimes and keeps getting caught, possesses such advanced knowledge, and is able to navigate myriad sentencing laws and statutory cross-references so confidently, that he would exalt his legal judgment over that of a judge who told him differently. That is *precisely the point*

of Rule 401(a)—to require the institution that should be able to better navigate such laws to inform the otherwise uninformed defendant, in order to safeguard his right to counsel.

¶ 162   The fact that defendant knew he was "Class X" in another case, based on a different criminal charge, does not persuade me that he knew that he was facing 6 to 30 years in prison in this case. Maybe defendant thought his Class X status did not apply to a charge for residential burglary. Maybe he did not know that the charge for *simple* residential burglary was 4 to 15 years, and he thought that the 4-to-15 range the circuit judge gave him *was* the elevated sentence based on his Class X status. As a matter of law, those would be incorrect assumptions, but we are not talking about what was actually, legally correct. We are talking about what this defendant knew and understood, after the trial judge explicitly told him his maximum sentence was 15 years. No matter what defendant might have thought he understood before being admonished, any reasonable person in his shoes would re-think his own understanding of the sentencing laws after being admonished otherwise by the judge.

¶ 163   The criminal sentencing statutes, after all, are not exactly light reading. As we have frequently noted, even lawyers and judges have been known, from time to time, to misstate or misapply them.[3]

¶ 164   We should not hold a criminal defendant to a higher standard than the judge who admonished him. With the undisputed fact that defendant was never "informed" that the

---

[3]  See, *e.g.*, *People v. Whitfield*, 228 Ill. 2d 502, 506 (2007) (State mistakenly advised court of defendant's criminal history; defendant was actually ineligible for probation and subject to mandatory Class X sentence); *People v. Douglas*, 2014 IL App (4th) 120617, ¶ 45 (remanding for new sentencing hearing where trial court erred in sentencing defendant as Class X offender); *People v. Ellis*, 375 Ill. App. 3d 1041, 1045 (2007) (trial court erroneously told defendant he faced sentence as Class 2 felon when he was actually required to be sentenced as Class X offender); *People v. Baaree*, 315 Ill. App. 3d 1049, 1053 (2000) (where relevant statute, by its terms, did not apply to defendant, trial court erred in finding that defendant was subject to mandatory Class X sentencing); *People v. Hare*, 315 Ill. App. 3d 606 (2000) (where defendant was subject to Class X sentencing and applicable minimum sentence was six years, but State agreed, in exchange for guilty plea, to recommend four-year sentence which trial court imposed but later vacated as void).

sentencing range he faced was 6 to 30 years, and without any showing in the record that defendant otherwise "understood" that to be his sentencing range, there was no compliance, substantial or otherwise, with Supreme Court Rule 401(a)(2) (eff. July 1, 1984).

¶ 165   The majority concludes that defendant's waiver of counsel was knowing and intelligent. But absent any compliance with Rule 401(a)(2), that conclusion simply cannot be justified.

¶ 166   Why? Because the supreme court said so. The supreme court did not have to adopt Rule 401(a). It could have merely required courts to enforce the underlying constitutional guarantee that a waiver of counsel be knowing and intelligent, which of course is what Rule 401(a) is intended to safeguard. *People v. Haynes*, 174 Ill. 2d 204, 236 (1996). The court has done that, for example, with waivers of jury trials, where instead of requiring specific admonishments, a reviewing court simply asks the ultimate constitutional question—whether the accused knowingly and understandingly waived his right to a jury. See *People v. Tooles*, 177 Ill. 2d 462, 469 (1997). But in the context of a waiver of counsel, the court chose to require three specific admonishments.

¶ 167   I view the admonishments required in Rule 401(a) as mandatory minimum requirements for a knowing and intelligent waiver of counsel. Without at least substantial compliance with that rule, a knowing and intelligent waiver of counsel cannot be found.

¶ 168   I do not mean to suggest that some of the factors the majority has considered—the defendant's extensive exposure to criminal courts, his overall appreciation of the importance of a lawyer and the consequences of waiving one, the lack of any discernible "prejudice" resulting from the defective admonishments—could never be relevant to the Rule 401(a) analysis. They are, just not in the way the majority uses them. As I understand supreme court precedent, the analysis should proceed as follows:

¶ 169   If the trial court informs the defendant of the required information *and* the defendant understands it, there is strict compliance with Rule 401(a), and a reviewing court can be assured of a knowing and intelligent waiver of counsel. The inquiry thus comes to an end. If *neither* of these facts can be found in the record, then we have no compliance with Rule 401(a)—a mandatory minimum requirement for a knowing and intelligent waiver has not been met—and the inquiry comes to an end.

¶ 170   If, however, the trial court fails to properly "inform" the defendant of his sentencing range but the record shows that the defendant somehow "understood" that range, anyway, there is substantial compliance with the rule. But in that instance, the inquiry does *not* end. If imperfect but substantial compliance is determined, we cannot be *certain* that the defendant's constitutional rights have been protected (as we could with strict compliance), so the supreme court demands a further inquiry to determine whether the record otherwise demonstrates a knowing and intelligent waiver, and whether defendant was prejudiced by the deficient admonishments. This, in my view, is what the supreme court meant when it wrote the passage below, which has been quoted in virtually every appellate decision considering this issue:

> "Substantial compliance with Rule 401(a) is sufficient to effectuate a valid waiver of counsel if the record indicates the waiver was made knowingly and intelligently [citation] and the admonishment the defendant received did not prejudice his rights." *People v. Kidd*, 178 Ill. 2d 92, 113 (1997); see also *People v. Coleman*, 129 Ill. 2d 321, 333 (1989) (same language as *Kidd* but without mentioning prejudice); *Haynes*, 174 Ill. 2d at 236 (nearly identical language to *Kidd*); *Johnson*, 119 Ill. 2d at 132 (substantively identical language).

73

¶ 171   I respectfully submit that the majority, and some other appellate decisions, have misread and misapplied this language from the supreme court. The majority reads this language as holding that a reviewing court may find substantial compliance if it determines from the record that the waiver was otherwise knowing and intelligent, and that the defendant suffered no prejudice. But that is just jumping straight to the constitutional question and ignoring the role of Rule 401(a) in the process. I believe that what the supreme court meant was that we must first determine whether we can find substantial compliance based on what the defendant understood, and if and only if we can, we must *then* continue the analysis of the record to search for an otherwise knowing and intelligent waiver and the absence of prejudice, to ensure the protection of the defendant's constitutional rights.

¶ 172   In other words, two separate determinations must be made to find a valid waiver in the absence of strict compliance with Rule 401—(1) a finding of substantial compliance, and, if that determination is made, (2) a finding from the record overall that the waiver was otherwise knowing and intelligent, and the defendant suffered no prejudice as a result of the imperfect, but substantially compliant, admonishments.

¶ 173   The majority, in my mind, uses (2) to prove (1), when it should have required (1) *and* (2) before finding a valid waiver. I believe that (1) cannot be established here, and thus it was unnecessary to even consider (2).

¶ 174   I believe this analysis is supported by a careful review of supreme court case law on Rule 401(a).

¶ 175   In *Coleman*, 129 Ill. 2d at 331-32, the defendant was admonished that he faced a possible sentence of death if he was convicted of murder, but he was not told that the minimum sentence if convicted would be life imprisonment. The State argued that the trial court substantially

complied with Rule 401(a). *Id*. at 332. The supreme court first noted that "[s]ubstantial compliance with Rule 401(a) is sufficient to effectuate a valid waiver of counsel *if* the record indicates that the waiver was made knowingly and intelligently." (Emphasis in original.) *Id*. at 333. The supreme court held that "that the circuit court substantially complied with Rule 401(a)" (*id*.) because the defendant had been advised of the correct maximum sentence (death) and all of the other requirements of Rule 401(a) had been met except the correct minimum sentence. *Id*. at 333-34. The court held that, "[w]here a defendant knows the nature of the charges against him and understands that as a result of those charges he may receive the death penalty, his knowledge and understanding that he may be eligible to receive a lesser sentence pales in comparison." *Id*. at 334. If the prospect of death was not enough to startle the defendant to his senses about his decision to waive counsel, a lesser sentence surely would not.

¶ 176   The court then wrote: "As we find that the circuit court substantially complied with Rule 401(a), *we must next determine* whether the defendant's waiver of counsel, despite the incorrect admonishment of the minimum sentence, was made knowingly and intelligently." (Emphasis added.)  *Id*.

¶ 177   The court then proceeded to find that, despite the less-than-perfect admonishments, the defendant's right to counsel was sufficiently protected. The court noted that there had been mention at the arraignment of a mandatory minimum life sentence. *Id*. at 335. And the defendant himself, appearing *pro se* at his sentencing hearing, mentioned that the choice before the jury was death or life in prison. *Id*. The court also noted that the defendant had engaged in gamesmanship, asking for a lawyer and then refusing one, asking for a different lawyer and then changing his mind. *Id*. at 339 ("The record supports the circuit court's finding that the

defendant used his right to counsel and his right to waive counsel in a manner designed to frustrate and manipulate the proceedings.").

¶ 178    The supreme court summarized its holding as follows:

"We hold that despite its incorrect admonishment of the minimum sentence, the circuit court sufficiently admonished the defendant in accordance with Rule 401(a) [citation], *and* that the defendant made a knowing and intelligent waiver of counsel at the guilt and sentencing phases of his trial. The record reveals that the defendant knew that the minimum sentence was natural life imprisonment, offered legitimate reasons for waiving his right to counsel, and attempted to manipulate the proceedings by repeatedly refusing the services of his counsel." (Emphasis added.) *Id*. at 340.

¶ 179    The only conclusion to be drawn from *Coleman* is that a reviewing court must first determine whether a trial court substantially complied with Rule 401(a), and if (and only if) it so finds, it "must next determine whether the defendant's waiver of counsel, despite the incorrect admonishment of the minimum sentence, was made knowingly and intelligently." *Id*. at 334.

¶ 180    Likewise, in *Kidd*, 178 Ill. 2d at 113-14, the supreme court again found substantial compliance where the trial court misstated one of the charges (calling it aggravated arson when it was really simple arson) and incorrectly told the defendant that his minimum sentence would be 20 years, not life, but also told the defendant he was facing the maximum sentence of death. The court wrote:

"Here the record shows that the trial court complied substantially with Rule 401(a), informing defendant of the nature of the charges against him, explaining to him that the death penalty was the maximum sentence, and advising him of his right to counsel. *Thus,*

*we must next determine* whether defendant's waiver of counsel was made knowingly and intelligently, despite the incorrect admonishment concerning one of the charges and the minimum sentence. See *Coleman*, 129 Ill. 2d at 334 [remainder of citation omitted]." (Emphasis added.) *Kidd*, 178 Ill. 2d at 114.

¶ 181   In making that "next" determination, the court considered that the defendant chose to waive counsel because of his belief that his lawyer had failed him in his previous trial. *Id.* The court also found no suggestion that the trial court's understatement of the minimum sentence for murder played a role in his decision to proceed *pro se*. *Id.* Finally, the court noted that the trial court's failure to state the proper charge (arson) could not have lulled the defendant into waiving counsel, given that the defendant was told the charge was *more* serious than it actually was, and also given that the defendant faced 10 counts of murder. *Id*. The court then concluded that, because defendant was told of the most serious crime's maximum sentence, the defendant "suffered no prejudice as a result of the trial court's failure to state correctly the minimum penalty to which he would be subjected if convicted." *Id*. Again, *Kidd* demonstrates that the supreme court considered the question of substantial compliance to be the first question when strict compliance could not be found, and only after finding substantial compliance did it proceed to the next step of reviewing the record overall to make these other findings of prejudice and an otherwise knowing and intelligent waiver.

¶ 182   In *Johnson*, 119 Ill. 2d 119, the Illinois Supreme Court once again found substantial compliance where the defendant was not told that his minimum sentence for felony murder would be life imprisonment, but he was correctly told that he could receive the death penalty. In addition, the record showed that, "[a]lthough the trial court did not advise defendant that life imprisonment was the minimum penalty to which he would be subjected in the event he was

convicted of the charges, the record reveals that he was aware of this penalty." *Id*. at 132. The court cited examples of a pretrial dispute between the parties over *voir dire* questions concerning life imprisonment, at which the State had noted that life imprisonment was a " 'mandatory sentence.' " *Id*. at 132-33. The record further revealed that the defendant indicated that his previous attorney had advised him of the applicable sentencing range. *Id*. at 133. Finally, the court noted that, while the defendant refused the appointment of counsel, he had the benefit of standby counsel. *Id*. at 136.

¶ 183    The court did take other considerations into account, including that the defendant "was no stranger" to the criminal justice system, as he had been previously convicted and sentenced to death for murder and other violent forcible felonies in another case, and thus the defendant "had ample opportunity to become acquainted with his right to counsel" (*id*. at 133); that the defendant suffered no prejudice as a result of the faulty admonishments (*id*. at 134); and that defendant had abused the process by repeatedly requesting and then refusing counsel, bouncing from different lawyers and his desire to appear *pro se* (*id*. at 134-35).

¶ 184    But these considerations mentioned in the preceding paragraph were not relevant to the question of substantial compliance. They were relevant to the additional determination, after *first* finding substantial compliance, of a knowing and intelligent waiver and the absence of prejudice, in order to determine whether substantial compliance was sufficient in that case to protect the defendant's rights. The supreme court's summary of its holding says as much:

> "We believe that where, as here, a review of the entire record indicates that defendant's waiver of his right to counsel was made knowingly and voluntarily, and the sole admonishment which he did not receive in no sense prejudiced defendant's rights, *substantial compliance with Rule 401(a) is sufficient* to effectuate a valid waiver of

counsel. *Further*, under the circumstances of this case, *we find that the trial court's admonishments substantially complied with the Rule*." (Emphases added.) *Id*. at 132.

¶ 185   The court did not find substantial compliance because the record revealed the defendant's knowing and intelligent waiver, or because there was a lack of prejudice. It found substantial compliance because (i) the defendant had been told of a possible death sentence, which should be sufficient to alert any defendant to the gravity of his decision to waive counsel, and (ii) the defendant knew what his mandatory minimum sentence was, even though the trial court did not tell him. The court then held that substantial compliance was sufficient in this case to protect the defendant's constitutional rights, in light of the overall record revealing a knowing and intelligent waiver and the absence of prejudice. There can be no doubt that the supreme court considered these to be two separate questions, just as it did in *Coleman* and *Kidd.*

¶ 186   *Haynes*, 174 Ill. 2d at 242-43, was another capital-murder case, where the court again rejected the defendant's claim of a Rule 401(a) violation. The supreme court considered several arguments not pertinent here, but the supreme court also considered a claim that the trial court violated Rule 401(a) by failing to inform the defendant of the minimum and maximum sentences for his burglary charge. *Id*. at 242. The supreme court began its analysis with the now oft-quoted principle that "[s]ubstantial compliance will be sufficient to effectuate a valid waiver if the record indicates that the waiver was made knowingly and voluntarily, and the admonishment the defendant received did not prejudice his rights." *Id*. at 236. Relying on *Coleman* and *Johnson*, the court found substantial compliance because the defendant was told that he faced a death sentence, and the importance of knowing his maximum sentence for the far less significant charge of burglary paled by comparison. *Id*. at 243. The court thus concluded: "Accordingly, we

79

hold that [the trial court's] admonishments, despite the omission of the sentences for burglary, substantially complied with Rule 401(a)." *Id*.

¶ 187    In the next sentence, the court wrote: "*In addition*, the record as a whole clearly demonstrates that the defendant's decision to waive counsel was made freely, knowingly and intelligently." (Emphasis added.) *Id*. The court noted that the defendant repeatedly expressed the desire to represent himself and understood the role an attorney would play, particularly given that he received the assistance of counsel for a time before trial. *Id*. at 243-44. Thus, once again, the supreme court first found substantial compliance based on what the trial court told the defendant, finding the information given less than perfect but sufficient to constitute substantial compliance, *before* considering the question of whether the waiver was otherwise knowing and intelligent.

¶ 188    Each of these four supreme court decisions makes clear that, if strict compliance cannot be found, the question of substantial compliance is the next question, based on what the trial court told the defendant and what the defendant understood. If and only if substantial compliance is first found should the court proceed to the third step to determine whether substantial compliance was enough in that particular case to ensure a knowing and intelligent waiver of counsel and the absence of prejudice.

¶ 189    The supreme court has likewise made it clear that, if a reviewing court cannot find even *substantial* compliance with Rule 401(a), the court must find error. In *Campbell*, 224 Ill. 2d at 82, the trial court failed to admonish the defendant before allowing the defendant to proceed *pro se* at his trial for driving with a suspended license, a Class A misdemeanor. The supreme court held that "there was no compliance, substantial or otherwise, with Rule 401(a). *** Defendant's waiver of counsel was therefore ineffective, and his conviction cannot stand." *Id*. at 84-85. The

court inquired no further on this question. It did not review the record as a whole to determine whether the defendant knowingly and intelligently waived counsel, nor did it search for the presence or absence of prejudice. Other than rejecting an argument not relevant here (whether the constitutional right to counsel attaches if the defendant does not receive a prison sentence), the court proceeded directly from the language quoted above to its conclusion:

> "The rules of this court are not suggestions; rather, they have the force of law, and the presumption must be that they will be obeyed and enforced as written. [Citations.] Here, defendant was charged with an offense that is punishable by up to one year of imprisonment, and he expressed his desire to proceed without counsel. Under the plain language of Rule 401(a), he was entitled to be advised of his rights, and the trial court's failure to do so was error. Ordinarily, that error would compel the reversal of defendant's conviction and a remand for a new trial. In this case, however, defendant has already discharged his sentence, and a new trial therefore would be neither equitable nor productive. Accordingly, we agree with the appellate court's conclusion that defendant's conviction must be vacated." *Id*. at 87-88.

¶ 190    *Campbell* confirms that, where a reviewing court cannot even find substantial compliance with Rule 401(a), the inquiry stops there. Again, that is because "[t]he purpose of this rule is 'to ensure that a waiver of counsel is knowingly and intelligently made' " (*id*. at 84 (quoting *Haynes,* 174 Ill.2d at 241)), and if the admonishments did not even substantially comply with the rule, a court will find that the waiver of counsel was *not* knowing and intelligent.

¶ 191    Let me make my point a different way. What if, instead of giving the incorrect sentencing range of 4 to 15 years in this case, the trial judge had not mentioned any sentence whatsoever, totally skipping that part of the admonishment? I would think the majority would feel compelled

to follow *Campbell* and hold that, absent any mention whatsoever of defendant's sentencing range, there was no compliance with Rule 401(a). But how is what actually happened in this case any better? To me, it is no improvement on silence to give the wrong sentencing range, when that range understates the maximum penalty by half. Personally, I would rather be told nothing, and be left to wonder and perhaps to investigate my potential sentence, as opposed to being given information that, unbeknownst to me, is far off the mark and greatly understates the consequences of my decision. In any event, wrong information is certainly no better than no information.

¶ 192   So why shouldn't we follow *Campbell* and find a Rule 401(a) violation here? Because our defendant is well-schooled in the criminal justice system and seems to understand the importance of a lawyer based on his experience? The supreme court in *Campbell* never asked that question. Because our defendant suffered no prejudice from that improper admonishment? *Campbell* did not ask that question, either. It was not necessary to consider those factors, because there was no compliance with Rule 401(a), and thus reversible error was found without any further inquiry. I cannot understand why the result the majority reaches is different than the one reached by *Campbell*. The only meaningful difference between this case and *Campbell* is the difference between being told no sentencing range versus being told a dramatically incorrect, understated one.

¶ 193   In sum, I believe that these cases from our supreme court have laid out an analysis that is quite clear:

> (1) If the reviewing court finds strict compliance with Rule 401(a), the court can be satisfied that the defendant's waiver of counsel was knowing and intelligent, because the very purpose of Rule 401(a) is to ensure that fact.

(2) If the court finds a lack of strict compliance with Rule 401(a) but finds substantial compliance, based on what the defendant was told and what he understood, the court's inquiry is not completed. Because it is not *necessarily* clear that the defendant's waiver was knowing and intelligent, the court must next review the record to determine whether the defendant's waiver was knowing and intelligent and whether the defendant suffered prejudice from the imperfect but substantially compliant admonishments.

(3)     If the court cannot find even substantial compliance with Rule 401(a), a knowing and intelligent waiver cannot be found, and error has occurred.

¶ 194   I believe that this case falls within the third scenario, and I would hold that reversible error was committed by the trial court's noncompliance with Rule 401(a). Because there was no compliance, substantial or otherwise, with Rule 401(a), it was unnecessary for the majority to consider whether the record otherwise demonstrated a knowing and intelligent waiver or the absence of prejudice.

¶ 195   For this reason, I also agree with the body of appellate case law that holds that, where the trial court did not even substantially comply with Rule 401(a), we presume prejudice for the purposes of determining the "prejudice" element of plain error. See, *e.g.*, *People v. Brzowski*, 2015 IL App (3d) 120376, ¶ 42 (failure to issue Rule 401 admonitions amounts to plain error); *People v. Wright*, 2015 IL App (1st) 123496, ¶ 49, *appeal allowed*, No 119561 (November 25, 2015)  ("under the second prong of the plain error analysis, an unknowing waiver of the right to counsel is such a serious error due to the right involved that prejudice will be presumed"); *People v. Allen*, 220 Ill. App. 3d 772, 781 (1991) ("If an accused is deprived of counsel at any of these critical stages, he is entitled to relief without showing that he was prejudiced thereby; the

deprivation of counsel is deemed *per se* reversible error."); *People v. Vernón,* 396 Ill.App.3d

145, 152-53 (2009) ("When a defendant suffers a complete absence, at a 'critical stage' of the

prosecution, of the sixth amendment right to counsel, he or she is entitled to a reversal of that

conviction without showing that the deprivation caused him or her prejudice."); *People v. Black*,

2011 IL App (5th) 080089, ¶ 24 (citing numerous cases where failure to issue Rule 401

admonitions was plain error).

¶ 196    These cases are consistent with our supreme court's decisions stating that a reviewing

court is to consider prejudice (as well as whether the record overall shows a knowing and

intelligent waiver) if and only if substantial compliance is first found. If there is not even

substantial compliance with Rule 401(a), prejudice is presumed and error—even plain error—has

occurred. [4]

¶ 197    The majority rejects plain error because it says that defendant cannot demonstrate that the

outcome of the *trial* would have been different. But I am not suggesting that the remedy for this

violation is a new trial, and neither is defendant. The Rule 401(a) error was limited to the critical

---

[4] The United States Supreme Court "has uniformly found constitutional error *without any showing of prejudice* when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." (Emphasis added.) *United States v. Cronic*, 466 U.S. 648, 659 n.25 (1984); see *United States v.Gonzalez-Lopez*, 548 U.S. 140, 147-48 (2006) (erroneous deprivation of defendant's right to counsel "of one's choice" not subject to harmless-error review; no additional showing of prejudice is required); *Gardner v. Florida*, 430 U.S. 349, 358 (1977) (defendant has right to counsel at sentencing hearing, "even if he may have no right to object to a particular result of the sentencing process"); *Geders v. United States*, 425 U.S. 80, 86 (1976) (rejecting lower court's prejudicial-error analysis and holding that trial court's order barring counsel from conferring during overnight recess with defendant, while defendant was in midst of testifying, was error); *Herring v. New York*, 422 U.S. 853, 858, 864 (1975) (statute denying counsel opportunity to make closing argument violated defendant's sixth amendment right, "no matter how strong the case for the prosecution may appear" and even though "[t]here is no way to know whether these or any other appropriate arguments in summation might have affected the ultimate judgment in this case"); *Hamilton v. Alabama*, 368 U.S. 52, 55 (1961) (where defendant is denied counsel at critical stage of arraignment, "we do not stop to determine whether prejudice resulted"); *White v. Maryland*, 373 U.S. 59, 60 (1963) (*per curiam*) (reversing conviction where defendant not represented by counsel at arraignment; "We repeat what we said in [*Hamilton v. Alabama*], that we do not stop to determine whether prejudice resulted ***.").

stage of the suppression hearing, and the remedy should be so limited, as well. I believe that we should vacate the court's denial of the motion to suppress and remand for a new suppression hearing only. If that motion were denied again, the court would simply reinstate the conviction for residential burglary.

¶ 198    I have no sympathy for a man who, in his past, has committed several burglaries and robberies, some violent and some preying on the elderly, and who obviously has first-hand knowledge about the importance of having a lawyer versus going *pro se*. But this case is not just about Lamarr Maxey. It is also about Rule 401(a). If a trial court completely misstates the sentencing range, the record does not show that the defendant otherwise knew the correct range, and the defendant ultimately received a sentence in excess of the maximum sentence he was promised, we must find error. If we forgive that error because we think that, overall, defendant was an experienced veteran of the criminal courts, he understood the importance of a lawyer, and he suffered no prejudice, then we might as well get rid of Rule 401(a) altogether, because we are not enforcing it. Under the interpretation of Rule 401(a) that our supreme court has set out, the trial court's admonishments were noncompliant. The inquiry should end there. Prejudice should be presumed. I would find plain error in this case. I would vacate the ruling on the motion to suppress—the critical stage where defendant proceeded *pro se*, before deciding to retain counsel at trial—and remand for a new suppression hearing. A new trial would be required only if defendant succeeded on that motion; otherwise, the conviction would be reinstated.